NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2393-13T3

NORTH JERSEY MEDIA GROUP INC.,
d/b/a COMMUNITY NEWS,

    Plaintiff-Appellant,

v.

BERGEN COUNTY PROSECUTOR'S
OFFICE and FRANK PUCCIO, in
his capacity as Custodian of
Records for the BERGEN COUNTY
PROSECUTOR'S OFFICE,

    Defendants-Respondents.

---

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **August 31, 2016** |
| **APPELLATE DIVISION** |

Argued November 17, 2015 — Decided August 31, 2016

Before Judges Fisher, Espinosa and Rothstadt.

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Docket No. L-6741-13.

Jennifer A. Borg, General Counsel, argued the
cause for appellant (North Jersey Media Group,
Inc., attorneys; Ms. Borg, of counsel and on
the briefs; Robert D. Thompson and Bobby D.
Conner, on the briefs).

John M. Carbone argued the cause for
respondents (Carbone and Faasse, attorneys;
Mr. Carbone, of counsel and on the brief;
Frank T. Puccio, on the brief).

Thomas J. Cafferty argued the cause for amici
curiae The Reporters Committee for Freedom of
the Press and 25 Media Organizations (Gibbons
PC, and Bruce D. Brown of the Massachusetts

and District of Columbia bars, admitted pro
hac vice, attorneys; Mr. Cafferty, of counsel
and on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

This matter concerns a news organization's request for records from a prosecutor's office regarding a person who was not charged with any crime pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, and the common law right of access. The prosecutor's office declined to confirm or deny the existence of responsive records.

In this matter of first impression, we must determine whether the prosecutor's response was permissible under OPRA and the common law or a violation thereof. For the reasons set forth below, we hold that an agency may "neither confirm nor deny" the existence of records in response to an OPRA request when the agency (1) relies upon an exemption authorized by OPRA that would itself preclude the agency from acknowledging the existence of such documents and (2) presents a sufficient basis for the court to determine that the claimed exemption applies. In this case, we conclude that records relating to a person who has not been arrested or charged with an offense are entitled to confidentiality based upon long-established judicial precedent. Therefore, pursuant to N.J.S.A. 47:1A-9(b), an exemption exists under OPRA

2

that precludes a custodian of records from disclosing whether such records exist in response to an OPRA request. We further conclude that the Bergen County Prosecutor's Office (BCPO) made a sufficient showing to avail itself of this exemption and that access is also properly denied under the common law right of access.

I.

Plaintiff, North Jersey Media Group, Inc., d/b/a Community News (NJMG), appeals from an order that dismissed its complaint against defendants, BCPO and its custodian of records, Frank Puccio, alleging a violation of OPRA and the common law right of access. One of NJMG's reporters[1] made an OPRA request to the BCPO "[i]n furtherance of the newsgathering process" for records concerning a person who had not been charged with any crime, whom we shall refer to as A.B.C. The following records were requested:

> 1. All law enforcement reports filed against or involving [A.B.C.] from January 1, 2003 to present.
>
> 2. All complaints and/or reports (verbal or written) made to law enforcement officials concerning [A.B.C.] from January 1, 2003 to present, including, but not limited to, his work at [three designated places of employment.]
>
> 3. Recordings and/or transcripts of 911 calls and/or non-emergency calls made between

---

[1] According to its complaint, NJMG publishes two daily newspapers, two websites and nearly forty weekly newspapers, including Community News.

3

January 1, 2003 and present related to [A.B.C.]

4. Written communications (e.g. emails and letters) to, from and/or between:

    a. BCPO and [A.B.C.]
    b. BCPO and [A.B.C.'s] attorney
    c. [A.B.C.'s employer]/Any representatives or affiliates . . . .

BCPO responded to this request by letter that stated in part:

You have requested <u>records related to someone who has neither been arrested nor charged with committing an offense</u>. In essence, this amounts to inquiring whether a person who has neither been arrested nor charged with committing an offense is, or has been, the subject of an investigation. <u>The [BCPO] will neither confirm nor deny whether an individual who has neither been charged nor arrested is, or has been, the subject of an investigation. Law enforcement agencies routinely receive allegations that are determined to be unprovable, unfounded or untrue. Identifying the target of such allegations could unfairly subject that individual to irreparable harm and subject this office and its employees to civil liability and professional discipline</u>. It is for this reason, among others, that grand jury proceedings are conducted in secret. More instructively, even when a crime has been committed, [OPRA] does not require a law enforcement agency to name suspects. When no arrest has been made, OPRA only requires a law enforcement agency to disclose "the type of crime, time, location and type of weapon, if any." <u>N.J.S.A.</u> 47:1A-3b. By not including the names of suspects in the list of items to be disclosed, the Legislature wisely chose to protect suspects who may be exonerated without being charged from the public scorn and stigma

4

that can arise from being the target of a criminal investigation.

[(Emphasis added).]

BCPO defended its refusal to confirm or deny the existence of such records:

> To suggest that a law enforcement agency must confirm or deny that someone is or has been has been [sic] the subject of an investigation even when no crime may have occurred by stating that records related to that individual are exempt from disclosure because they are criminal investigatory records is to create precisely the problem that the Legislature sought to avoid in enacting N.J.S.A. 47:1A-3b. Nothing in OPRA suggests such an unjust result and fundamental fairness prohibits it.

BCPO also wrote to the Government Records Council (GRC), seeking "both an advisory opinion and review/appeal" that would affirm the denial of access to the records sought, grant access to the records, or find "a clear and specific exemption from release of the records sought." In support of its denial of access, BCPO reviewed authorities for the proposition that information received by law enforcement authorities concerning possible criminal activities should be treated as confidential and privileged against disclosure and cited both the New Jersey Rules of Professional Conduct for Attorneys and the right to privacy guaranteed by the New Jersey Constitution.

5

Following BCPO's request for review by the GRC, NJMG filed an order to show cause and verified complaint, asserting its statutory prerogative to have the denial of access adjudicated by the Superior Court, N.J.S.A. 47:1A-6, and seeking declaratory judgment that BCPO violated OPRA and the common law right of access. The complaint also asked the court to require BCPO to submit a Vaughn index, in which the custodian of records identifies responsive documents and the exemptions it claims warrant non-disclosure. Vaughn v. Rosen, 484 F.2d 820, 826-27 (D.C. Cir. 1973), cert. denied, 415 U.S. 977, 94 S. Ct. 1564, 39 L. Ed. 2d 873 (1974); see also N.Y. Times Co. v. U.S. Dep't of Justice, 758 F.3d 436, 438 (2d Cir. 2014); Minier v. CIA, 88 F.3d 79, 803-04 (9th Cir. 1996).

The Bergen County Prosecutor, John L. Molinelli, submitted a certification that stated, in part:

> 2. I invoke and utilize all available privileges and exemptions to bar the release of the documents requested herein, including, but not limited to, criminal investigatory records, confidential, privacy and as otherwise permitted under the laws of the State of New Jersey.
>
> . . . .
>
> 4. In this instance and in others previously, unless an arrest has been made, charges are filed or a grand jury indictment is returned, I, as the Bergen County Prosecutor, will not respond to an inquiry about the receipt or possession of documents

or the existence or non-existence of a criminal investigation.

5. I believe this position is necessary and proper due to the constraints placed upon me by the Rules of Professional Conduct; particularly RPC 3.6 and 3.8.

6. Many times, when allegations contained in a letter or other communication are received by this office and are investigated, the allegations are found to be untrue or its [sic] determined that the allegations cannot be proven or the actions of the person implicated do not rise to a level of criminal conduct.

7. Disclosing, confirming or identifying the subject or content of such allegations as communicated would unfairly subject that person to irreparable harm and possibly raise against the [BCPO] a tort action by the person so identified for false light claims and civil liability.

8. When a reporter seeks such confirmation as a result of a tip, communication from the individual making the allegations, or an undisclosed, "off the record," not for attribution or deep throat source, it should not be the Prosecutor giving veracity, notoriety, approbation or confirming the issue for the press.

[(Emphasis added).]

BCPO later submitted, ex parte, documents described by the trial judge as "a sealed envelope containing a certification of [the custodian of records], including a two page Vaughn Index and a second sealed envelope containing copies of what defendants assert to be the criminal investigatory records." The trial judge

7

declined to examine the documents or <u>Vaughn</u> index because they were submitted under seal.[2]

The trial judge denied the relief sought and dismissed NJMG's complaint. In his written opinion, the judge rejected BCPO's contention that the criminal investigatory record exemption applied "because the record is void of any evidence of a pending investigation." Addressing BCPO's argument that disclosure would violate individual privacy rights, the judge considered and weighed the factors relevant to a determination whether the need for disclosure outweighs individual privacy concerns. <u>See</u> <u>Burnett v. Cnty. of Bergen</u>, 198 <u>N.J.</u> 408, 427 (2009); <u>Doe v. Poritz</u>, 142 <u>N.J.</u> 1, 88 (1995). He concluded, "records related to the investigation of an individual that has not been arrested [or] charged with a crime generally must not be disclosed as privacy concerns outweigh the public's need for the information." Turning to NJMG's claim that disclosure was required based upon the common law right of access, the judge considered and weighed the factors identified in <u>Loigman</u>, <u>supra</u>, 102 <u>N.J.</u> at 113, and concluded access to such records was not warranted under the common law right of

---

[2] The stated reason for the judge's decision not to review the <u>Vaughn</u> index submitted under seal was that he was not provided with any authority that permitted an in camera submission of the index. The Supreme Court has recognized that, in rare cases, an in camera submission is appropriate. <u>Loigman v. Kimmelman</u>, 102 <u>N.J.</u> 98, 111 (1986).

access because "disclosure of the requested information [would be] an unreasonable invasion of individual privacy."

NJMG raises a number of arguments in its appeal. First, NJMG challenges the trial court's interpretation of OPRA, contending the court created a new exemption for the denial of access to public records that is: not articulated in OPRA, inconsistent with its plain language; renders statutory provisions, i.e., N.J.S.A. 47:1A-3(b) and N.J.S.A. 47:1A-8, meaningless; and shifts the burden of proof from the public agency to the requestor of public records. NJMG argues further that, because defendants failed to certify facts to support their contention that requested records related to a person who had not been charged with a crime, the trial court relied upon an insufficient record and defendants failed to satisfy their burden of proof, N.J.S.A. 47:1A-6. NJMG also contends the trial court erred in misapplying the factors identified in Burnett and Loigman and in failing to require a Vaughn index or conduct an in camera review. Finally, NJMG argues the trial court erred in holding that its OPRA request implicates personal privacy rights protected by the New Jersey Constitution because this argument was not properly raised in the trial court. BCPO argues the trial court relied upon existing statutory exemptions, did not create a new exemption under OPRA, and properly weighed relevant facts and authorities.

9

We granted amicus curiae status to The Reporters Committee for Freedom of the Press and twenty-five media organizations.[3] In addition to joining NJMG's arguments, amici argue the response to neither confirm nor deny the existence of responsive documents, which has been permitted in response to requests for records under the Freedom of Information Act (FOIA), 5 U.S.C.A. § 552, has been overused and abused and should not be permitted in response to an OPRA request.

In light of our conclusion that the refusal to confirm or deny the existence of records relating to a person who has not been charged with an offense falls within an exemption to disclosure authorized by OPRA, we need not reach NJMG's remaining arguments.

## II.

The trial judge's determination that plaintiff's OPRA request was properly denied and the legal conclusion regarding the appropriate exemption are both legal issues subject to de novo

---

[3] Advance Publications, Inc., American Society of News Editors, The Asbury Park Press, The Associated Press, Association of Alternative Newsmedia, The Center for Investigative Reporting, Courier News, Courier Post, The Daily Journal, Daily Record, Dow Jones & Company, Inc., Home News Tribune, Investigative Reporters and Editors, Investigative Reporting Workshop at American University, National Newspaper Association, The National Press Club, National Press Photographers Association, New Jersey Press Association, The New York Times Company, News Corp, The Newspaper Guild — CWA, NYP Holdings, Inc., Online News Association, Time Inc., and Tully Center for Free Speech.

review.  N. Jersey Media Group, Inc. v. Twp. of Lyndhurst, 441 N.J. Super. 70, 89-90 (App. Div. 2015); K.L. v. Evesham Twp. Bd. of Educ., 423 N.J. Super. 337, 349 (App. Div. 2011), certif. denied, 210 N.J. 108 (2012).  Our review of the determination regarding the common law right of access is de novo as well. Drinker Biddle & Reath LLP v. N.J. Dep't of Law & Pub. Safety, 421 N.J. Super. 489, 497 (App. Div. 2011).  We note further, "appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion."  Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001).  Thus, although we reach the same conclusion as the trial court, we do so for different reasons.

A.

The Legislature's stated purpose in enacting OPRA was to make government records "readily accessible" to the public "with certain exceptions, for the protection of the public interest." N.J.S.A. 47:1A-1.  OPRA directs that "all government records shall be subject to public access unless exempt," and that "any limitations on the right of access . . . shall be construed in favor of the public's right of access."  Ibid.  The goal of such ready access is to promote good government.  "With broad public access to information about how state and local governments operate, citizens and the media can play a watchful role in curbing

11

wasteful government spending and guarding against corruption and misconduct." Burnett, supra, 198 N.J. at 414. The public's right to disclosure is not, however, absolute. Kovalcik v. Somerset Cnty. Prosecutor's Office, 206 N.J. 581, 588 (2011); Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 284 (2009).

OPRA provides that, upon receipt of a written request for access, the custodian "shall grant access to a government record or deny a request for access to a government record." N.J.S.A. 47:1A-5(i). N.J.S.A. 47:1A-5(g) sets forth the custodian's obligations upon receipt of an OPRA request. The custodian must "promptly comply with a request" and, if "unable to comply . . . shall indicate the specific basis therefor on the request form and promptly return it to the requestor." Ibid.; see also Gannett N.J. Partners, LP v. Cnty. of Middlesex, 379 N.J. Super. 205, 215 (App. Div. 2005). A public agency that denies access bears "the burden of proving that the denial of access is authorized by law." N.J.S.A. 47:1A-6. The custodian may not rely upon "conclusory and generalized allegations of exemptions," but must provide specific reasons for withholding documents. Newark Morning Ledger Co. v. N.J. Sports & Exposition Auth., 423 N.J. Super. 140, 162 (App. Div. 2011) (quoting Loigman, supra, 102 N.J. at 110).

12

From the outset, BCPO declined to confirm or deny the existence of responsive records and set forth its rationale for maintaining the confidentiality of information relating to "an individual who has neither been charged nor arrested . . . or has been[] the subject of an investigation." NJMG has characterized this as a "novel basis for denial." However, BCPO's response conforms to Standard 1.5(a), Contacts with the Public During the Investigative Process, of the ABA Standards on Prosecutorial Investigations, which states that, with limited, enumerated exceptions, "[t]he prosecutor should neither confirm nor deny the existence of an investigation, or reveal the status of the investigation, nor release information concerning the investigation." ABA Standards for Criminal Justice: Prosecutorial Investigations § 1.5(a) (3d ed. 2014).

This noncommittal response has come to be known as a Glomar response and had its origin in Phillippi v. CIA, 546 F.2d 1009 (D.C. Cir. 1976). The Central Intelligence Agency (CIA) responded to a FOIA request for records pertaining to the Hughes Glomar Explorer, an oceanic vessel publicly listed as a privately owned research ship that was allegedly owned by the federal government. Id. at 1011. The CIA asserted, "in the interest of national security, involvement by the U.S. Government in the activities

which are the subject matter of [the plaintiff's] request can neither be confirmed nor denied," claiming that the "existence or nonexistence of the requested records was itself a classified fact exempt from disclosure under . . . FOIA." Id. at 1012. The precise issue we face here — whether the public agency may decline to confirm or deny the existence of records — was not decided by the Phillippi court because the requestor in that case did not contend the government could never make such a claim based on national security considerations. Ibid.

However, by 2009, when the Court of Appeals for the Second Circuit announced it was joining its sister circuits in holding the Glomar doctrine available to agencies responding to FOIA requests, the court noted the doctrine was "well settled as a proper response to a FOIA request." Wilner v. NSA, 592 F.3d 60, 68 (2d Cir. 2009), cert. denied, 562 U.S. 828, 131 S. Ct. 387, 178 L. Ed. 2d 24 (2010). The court recognized the Glomar response as "the only way in which an agency may assert that a particular FOIA statutory exemption covers the 'existence or nonexistence of the requested records' in a case in which a plaintiff seeks such records." Ibid. (citation omitted).

The court emphasized that the availability of the Glomar response depended upon a showing that the conventional response to a FOIA inquiry "would cause harm cognizable under a [] FOIA

14

exception." Ibid. (alteration in original) (quoting Gardels v.
CIA, 689 F.2d 1100, 1103 (D.C. Cir. 1982)).

> To properly employ the Glomar response to a
> FOIA request, an agency must "tether" its
> refusal to respond to one of the nine FOIA
> exemptions — in other words, "a government
> agency may . . . refuse to confirm or deny the
> existence of certain records . . . if the FOIA
> exemption would itself preclude the
> acknowledgment of such documents."
>
> [Wilner, supra, 592 F.3d at 68 (emphasis
> added) (first citation omitted) (quoting
> Minier, supra, 88 F.3d at 800).]

Because the "existence or nonexistence of a record" must be "a
fact exempt from disclosure under" the exception relied upon, a
Glomar response is unavailable if "the existence or nonexistence
of the particular records covered . . . has been officially and
publicly disclosed." Wilner, supra, 592 F.3d at 70.

As is the case when an agency denies access under OPRA, see
N.J.S.A. 47:1A-6, the agency that relies upon a Glomar response
must prove the applicability of a specific exemption. Wilner,
supra, 592 F.3d at 68; Pipko v. CIA, 312 F. Supp. 2d 669, 679
(D.N.J. 2003). The agency may satisfy this burden by submitting
an affidavit that "describe[s] the justifications for
nondisclosure with reasonably specific detail, demonstrate[s] that
the information withheld logically falls within the claimed
exemptions, and show[s] that the justifications are not

15

controverted by contrary evidence in the record or by evidence of [] bad faith." Hunt v. CIA, 981 F.2d 1116, 1119 (9th Cir. 1992).

An example of the judicial analysis required to determine whether a Glomar response is appropriate is found in People for the Ethical Treatment of Animals v. National Institutes of Health, 745 F.3d 535 (D.C. Cir. 2014). A number of FOIA requests were made to the National Institutes of Health (NIH) regarding investigations of animal abuse at a university research lab. Id. at 538. One of these requests was for "materials related to all [NIH] investigations into complaints . . . regarding" three named researchers at the lab. Id. at 539. The exemption at issue was 5 U.S.C.A. § 552(b)(7)(C) (Exemption 7(C)), which, the court stated, supports such a response for "'records or information compiled for law enforcement purposes' . . . . if acknowledgment of responsive documents 'could reasonably be expected to constitute an unwarranted invasion of personal privacy.'" Id. at 541 (citation omitted). Noting the "substantial privacy interest held by the targets of law-enforcement investigations," ibid. (citation omitted), the court found a Glomar response appropriate "as to any documents that would confirm the existence of an investigation into the three named researchers." Id. at 544.

However, the court viewed the FOIA request to be more expansive, requiring consideration of whether a Glomar response

16

was available for another category of responsive documents subsumed within the request. The court concluded a <u>Glomar</u> response would not be justified under Exemption 7(C) for "documents showing that NIH responded to complaints about the three researchers by conducting an investigation that did not target the researchers themselves." <u>Id.</u> at 544. As to that category of documents, the purpose served by Exemption 7(C) was not defeated by an admission that responsive documents existed and so, the availability of the <u>Glomar</u> response was tailored accordingly. <u>See also</u> <u>Nation Magazine v. U.S. Customs Serv.</u>, 71 <u>F.</u>3d 885, 887-88 (D.C. Cir. 1995) (in reviewing FOIA request for records relating to offers made by H. Ross Perot to assist the Customs Service in drug interdiction efforts, the court rejected the agency's claim that Exemption 7(C) permitted a <u>Glomar</u> response to all requests for information regarding third persons in its investigative files).

C.

Consequently, we must determine whether the refusal to confirm or deny the existence of responsive records is an available response to an OPRA request. NJMG asserts that a refusal to confirm or deny the existence of responsive records is not permitted under OPRA. In NJMG's view, OPRA strictly limits the response an agency may make to a request for records, imposing an obligation to identify responsive records in every case as a

17

prerequisite to identifying the exemption relied upon. Like FOIA, there is no language in OPRA that explicitly permits an agency to decline to confirm or deny the existence of responsive records.[4] Although we note the absence of specific statutory authorization posed no obstacle to the adoption of the Glomar doctrine in either federal caselaw or in New York, see Matter of Abdur-Rashid v. New York City Police Dep't, 140 A.D.3d 419 (N.Y. App. Div. 2016), our concern is whether this response is permitted under OPRA.

Our role in interpreting a statute is to discern and give effect to the Legislature's intent. DiProspero v. Penn, 183 N.J. 477, 492 (2005). The plain language of the statute is "the best indicator" of legislative intent. In re Plan for the Abolition of the Council on Affordable Hous., 214 N.J. 444, 467 (2013). "If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over." Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007). When "a literal interpretation would create a manifestly absurd result, contrary to public policy," or "would lead to results inconsistent with the overall purpose of the statute," such interpretations

---

[4]  Our research has revealed one statute that expressly permits such a response. Indiana's Access to Public Records Act permits a state agency to "[r]efuse to confirm or deny the existence of the record" under certain circumstances if the agency considers the request to be for a record excepted from disclosure. Ind. Code Ann. § 5-14-3-4.4(a)(2).

18

should be rejected in favor of the spirit of the law. Hubbard v. Reed, 168 N.J. 387, 392-93 (2001) (citation omitted); Turner v. First Union Nat'l Bank, 162 N.J. 75, 84 (1999). When the language does not yield an unambiguous interpretation, we continue the process to discern legislative intent, interpreting statutory language "in accordance with common sense" and may "consider the entire legislative scheme of which a particular provision is but a part." Morristown Assocs. v. Grant Oil Co., 220 N.J. 360, 380 (2015). We may also turn to extrinsic evidence, "including legislative history, committee reports, and contemporaneous construction." DiProspero, supra, 183 N.J. at 492-93 (citation omitted); see also Burnett, supra, 198 N.J. at 421. There are many tools available for our analysis, but only one goal. "Regardless of the materials relied upon and the analytical tools employed, in the final analysis, courts should seek to effectuate the fundamental purpose for which the legislation was enacted." In re Young, 202 N.J. 50, 64 (2010) (citation omitted).

As we have noted, the obligation imposed upon the custodian of public records is to "promptly comply with a request" or, if "unable to comply," to "indicate the specific basis therefor on the request form and promptly return it to the requestor." N.J.S.A. 47:1A-5(g); see also Gannett N.J. Partners, supra, 379 N.J. Super. at 215. Other than providing a "specific basis" for

19

the inability to comply, the statute establishes no inflexible requirements for a non-compliance response. Whether an agency denies access to identified records or declines to confirm or deny responsive records exist, its reply falls within the category of "unable to comply" and is subject to review under that standard. Therefore, we discern no impediment to the availability of a <u>Glomar</u> response under OPRA's plain language.

We also reject the interpretation urged by NJMG that the submission of a <u>Vaughn</u> index is required in all cases in which the agency does not comply with a request. Neither OPRA nor FOIA calls for the production of a <u>Vaughn</u> index in every case in which access is denied. Although the use of such a log has become customary, courts that have considered this issue have cautioned that the production and review of a <u>Vaughn</u> index is not appropriate in every case. Federal courts have ruled that, when an agency submits a <u>Glomar</u> response supported by an affidavit that is "sufficient to establish that the requested documents should not be disclosed, a <u>Vaughn</u> index is not required." <u>Minier</u>, <u>supra</u>, 88 <u>F</u>.3d at 804. The rationale is that "acknowledging even the existence of certain records would reveal information entitled to be protected." <u>N.Y. Times Co.</u>, <u>supra</u>, 758 <u>F</u>.3d at 438 n.3.

By way of example, in <u>Wilner</u>, <u>supra</u>, 592 <u>F</u>.3d 60, the question was whether the National Security Agency's <u>Glomar</u> response was

20

properly rooted in 5 U.S.C.A. § 552(b)(3) (Exemption 3), an exemption that states FOIA does not apply to matters exempted from disclosure by other statutes under specified conditions.[5] The court found a Vaughn index was unnecessary because this exemption "depends less on the detailed factual contents of specific documents" and thus "the sole issue for decision [was] the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." Wilner, supra, 592 F.3d at 72 (quoting Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd., 830 F.2d 331, 336 (D.C. Cir. 1987)); see also Vaughn, supra, 484 F.2d at 826-27 (acknowledging that the specificity of the index need not "contain factual descriptions that if made public would compromise the secret nature of the information"); ACLU v. FBI, 59 F. Supp. 3d 584, 594 (S.D.N.Y. 2014); Pipko, supra, 312 F. Supp. 2d at 680.

D.

We next turn to NJMG's argument that the only available exemptions to disclosure are those enumerated as protected categories within the four corners of OPRA. NJMG's argument is belied by the very statutory provisions it cites for support.

---

[5] Exemption 3 is similar to N.J.S.A. 47:1A-9(b). However, because the OPRA provision recognizes privileges established by judicial decision and other means, it is broader in scope than Exemption 3.

21

N.J.S.A. 47:1A-1 explicitly recognizes that records may be exempt from public access based upon authorities other than the exemptions enumerated within OPRA:

> [A]ll government records shall be subject to public access unless exempt from such access by: [OPRA] as amended and supplemented; any other statute; resolution of either or both houses of the Legislature; regulation promulgated under the authority of any statute or Executive Order of the Governor; Executive Order of the Governor; Rules of Court; any federal law, federal regulation, or federal order.
>
> [(Emphasis added).]

Moreover, N.J.S.A. 47:1A-9 codifies the Legislature's unambiguous intent that OPRA not abrogate or erode existing exemptions to public access:

> a. The provisions of [OPRA] shall not abrogate any exemption of a public record or government record from public access heretofore made pursuant to [the Right-to-Know Law, N.J.S.A. 47:1A-1 to -4]; any other statute; resolution of either or both Houses of the Legislature; regulation promulgated under the authority of any statute or Executive Order of the Governor; Executive Order of the Governor; Rules of Court; any federal law; federal regulation; or federal order.
>
> b. The provisions of [OPRA] shall not abrogate or erode any executive or legislative privilege or grant of confidentiality heretofore established or recognized by the Constitution of this State, statute, court rule or judicial case law, which privilege or grant of confidentiality may duly be claimed to restrict public access to a public record or government record.

22

[(Emphasis added).]

Directly applying OPRA's language, the Supreme Court recognized exemptions for documents protected by the attorney-client privilege and the work-product doctrine. O'Boyle v. Borough of Longport, 218 N.J. 168, 185 (2014). See also Mason v. City of Hoboken, 196 N.J. 51, 65 (2008); Slaughter v. Gov't Records Council, 413 N.J. Super. 544, 550 (App. Div. 2010) (stating it was "clear that an exemption from a right of public access to a government record can be established" by both administrative rule and by an executive order of the Governor), certif. denied, 208 N.J. 372 (2011).

Therefore, the plain language of the statute as well as judicial precedent make it clear that an exemption is statutorily recognized by OPRA if it is established by any of the authorities enumerated in N.J.S.A. 47:1A-1 or -9.

N.J.S.A. 47:1A-9(b) has three requirements for a grant of confidentiality to shield a record from disclosure under OPRA. First, there must be a grant of confidentiality established or recognized by any of the enumerated authorities. Second, the nature of the privilege must provide a reasonable basis for the restriction of public access to the record. Third, the privilege must have been established or recognized prior to the enactment of OPRA. All three requirements are met as to the confidentiality

23

of information regarding a person who has not been arrested or charged with an offense.

Long before the enactment of OPRA, the confidentiality of information law enforcement authorities receive regarding possible criminal activity was recognized in our caselaw.

> The <u>receipt</u> by appropriate law enforcement officials <u>of information concerning the existence or occurrence of criminal activities</u> is critical to the uncovering and the prosecution of criminal offenses, and is thus crucial to effective law enforcement. In order that the flow of such information be not impeded or cut off, <u>the law has long treated the information as confidential and privileged against disclosure</u>, thereby protecting witness security, the State's relationship with its informants and witnesses, and other confidential relationships, among other things.
>
> [<u>State v. Marshall</u>, 148 <u>N.J.</u> 89, 273 (1997) (emphasis added) (citation omitted).]

"Confidentiality is vital not only because it serves to protect government sources of information, but also because it enhances the effectiveness of investigative techniques and procedures." <u>Nero v. Hyland</u>, 76 <u>N.J.</u> 213, 225 (1978). "[E]ven inactive investigatory files may have to be kept confidential in order to convince citizens that they may safely confide in law enforcement officials." <u>Ibid</u>. (citation omitted). <u>See also</u> <u>Loigman</u>, <u>supra</u>, 102 <u>N.J.</u> at 107-08 (recognizing "a high degree of confidentiality" in investigative materials relating to "the

24

government's need to conduct such affairs with skill, with sensitivity to the privacy interests involved, and in an atmosphere of confidentiality that encourages the utmost candor"); State v. Kearney, 109 N.J. Super. 502, 506 (Law Div. 1970).

In sum, before OPRA was enacted, judicial decisions recognized the need to maintain "a high degree of confidentiality" for records regarding a person who has not been arrested or charged. The confidentiality accorded such information promotes both the integrity and effectiveness of law enforcement efforts for the benefit of the public at large. In addition, the grant of confidentiality protects the privacy interest of the individual who, lacking an opportunity to challenge allegations in court, would face irremediable public condemnation. The need and scope of confidentiality recognized in our courts' decisions "may duly be claimed to restrict public access to a public record or government record." N.J.S.A. 47:1A-9(b). We therefore hold that, pursuant to N.J.S.A. 47:1A-9(b), an exemption exists for information received or maintained by law enforcement agencies regarding a person who has not been arrested or charged with an offense.

E.

BCPO did not specifically identify N.J.S.A. 47:1A-9(b) as the source of the exemption that shields the records sought here. We

25

therefore turn to the question whether BCPO's response "describe[d] the justifications for nondisclosure with reasonably specific detail, demonstrat[ing] that the information withheld logically falls within" the exemption. See Hunt, supra, 981 F.2d at 1119.

OPRA requires the custodian of records to "indicate the specific basis" for an inability to comply with an OPRA request. N.J.S.A. 47:1A-5(g). An agency denying access should identify applicable statutory provisions to facilitate judicial review. However, the mere recitation of an applicable exemption will generally be insufficient because the custodian may not rely upon "conclusory and generalized allegations of exemptions." Newark Morning Ledger, supra, 423 N.J. Super. at 162 (citation omitted). The sufficiency of the response is measured against whether the proffered reasons prove the applicability of a specific exemption. See Wilner, supra, 592 F.3d at 68.

In this case, we are mindful that the person whose privacy would be irreparably invaded had no opportunity to press the case against disclosure. See Gannett N.J. Partners, supra, 379 N.J. Super. at 214-15. We also note that, although the concept of protecting such information is long-standing and the response given here conforms to accepted standards of prosecutorial ethics, the precise issue of what exemption applies to protect this

26

information has not been addressed before. Therefore, under the circumstances of this case, we consider the totality of BCPO's response to discern whether the reasons given for its refusal to confirm or deny the existence of responsive records logically fall within the exemption authorized by N.J.S.A. 47:1A-9(b).[6]

Aside from N.J.S.A. 47:1A-3(b), BCPO did not explicitly identify other exemptions contained within OPRA that supported its rationale for declining to confirm or deny the existence of records here. The certification submitted in opposition to NJMG's complaint stated the "privileges and exemptions" available to bar access included "criminal investigatory records, confidential, [and] privacy." In addition, the certification cited the constraints imposed upon a prosecutor by the Rules of Professional Conduct.

In its initial response to NJMG's OPRA request, BCPO identified the request as seeking records "related to someone who has neither been arrested nor charged with committing an offense," amounting to an inquiry whether the person "is, or has been, the subject of an investigation." The response stated BCPO would

---

[6] It remains the burden of the custodian to show that the denial of access is properly grounded in an exemption authorized by OPRA. We do not intend that our review of exemptions not explicitly identified by BCPO should in any way relieve a custodian of public records from that burden or impose an obligation upon courts to sift through OPRA to determine if an appropriate exemption exists based upon the facts revealed.

27

"neither confirm nor deny whether an individual who has neither been charged nor arrested is, or has been, the subject of an investigation," and explained:

> Law enforcement agencies routinely receive allegations that are determined to be unprovable, unfounded or untrue. Identifying the target of such allegations could unfairly subject that individual to irreparable harm and subject this office and its employees to civil liability and professional discipline.

BCPO's response identified the irreparable harm suffered by a person who has been the subject of unproven allegations of criminal wrongdoing. We are satisfied that, under the circumstances here, the reasons BCPO provided for declining to confirm or deny the existence of responsive records adequately invoke and logically fall within the relevant exemption.

### F.

BCPO's response fairly implicated the general privacy provision, N.J.S.A. 47:1A-1, the criminal investigatory record exemption, N.J.S.A. 47:1A-1.1, and the investigation in process exemption, N.J.S.A. 47:1A-3. For the sake of completeness, we review these exemptions to explain why they do not provide a basis for the exemption we recognize under N.J.S.A. 47:1A-9(b).

We begin with the threshold requirement for a Glomar response. For an exemption to serve as a basis for a Glomar response, the

exemption itself must preclude the acknowledgment that responsive documents exist.  See Wilner, supra, 592 F.3d at 68.

A "criminal investigatory record" is defined as "a record which is not required by law to be made, maintained or kept on file that is held by a law enforcement agency which pertains to any criminal investigation or related civil enforcement proceeding."  N.J.S.A. 47:1A-1.1.  The agency relying upon this exemption must present sufficient facts to show: (1) the existence of a criminal investigation or related proceeding and (2) that the responsive records "pertain" to that proceeding.  Therefore, the agency that seeks to prove the applicability of this exemption must, as a preliminary step, acknowledge that responsive records exist.

The "investigation in process" exemption, N.J.S.A. 47:1A-3, shields records that "pertain to an investigation in progress by any public agency" if such access is "inimical to the public interest."  See, e.g., Courier News v. Hunterdon Cnty. Prosecutor's Office, 358 N.J. Super. 373, 380 n.5 (App. Div. 2003) (rejecting claim that access to a 911 tape one year after a homicide fell within the "investigation in progress" exemption).  This provision also depends upon proof that a criminal investigation exists.

The proofs necessary for the "criminal investigatory records" and "investigation in progress" exemptions cannot be reconciled

29

with the fact that the "existence or nonexistence of a record" must be "a fact exempt from disclosure under" an exemption relied upon for a <u>Glomar</u> response. Therefore, neither exemption provides a statutorily recognized authority for a <u>Glomar</u> response.

BCPO also relies upon <u>RPC</u> 3.8(f), which states:

> [E]xcept for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, [a prosecutor shall] refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused . . . .

This proscription has the force of court rule pursuant to <u>Rule</u> 1:14. However, the RPC fails to satisfy the other criteria for the exemption. A prohibition against making extrajudicial comments that could prejudice an accused is designed to curb prosecutorial misconduct. Because the RPC does not reference records or, more particularly, records relating to an uncharged suspect, it cannot be said to establish or recognize the confidentiality of public records maintained by the prosecutor as to persons who have never been charged with an offense. Moreover, the RPC did not become effective until 2004, after the enactment of OPRA. Therefore, it cannot provide a basis for an exemption under <u>N.J.S.A.</u> 47:1A-9(b).

BCPO also cited both the constitutional guarantee of privacy, <u>N.J. Const.</u> art. I, ¶ 1; <u>see</u> <u>Doe</u>, <u>supra</u>, 142 <u>N.J.</u> at 89, and the

30

privacy provision of OPRA, N.J.S.A. 47:1A-1, as grounds for the denial of access. In light of our conclusion that access may be denied based upon the exemption contained in N.J.S.A. 47:1A-9(b), resolution of the constitutional question is not "absolutely imperative in the disposition of the litigation" and "should not be reached." Burnett, supra, 198 N.J. at 420.

The general privacy provision contained in N.J.S.A. 47:1A-1 states "a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy." See Burnett, supra, 198 N.J. at 422-23 (emphasis added) (recognizing this privacy clause as a substantive provision of OPRA). Although "personal information" is not defined, OPRA does identify specific categories of information that either should not be disclosed or should be redacted from records that are disclosed. See, e.g., N.J.S.A. 47:1A-5(a) (requiring the redaction of "any information which discloses the social security number, credit card number, unlisted telephone number, or driver license number of any person"). The privacy provision has been found to require denial of access to social security numbers, Burnett, supra, 198 N.J. at 428, and the names and telephone numbers of persons called from government-issued telephones. Livecchia v. Borough of Mount

31

Arlington, 421 N.J. Super. 24, 29 (App. Div. 2011).  It is not applicable to the settlement of a sexual harassment and discrimination lawsuit against a county, Asbury Park Press v. Cnty. of Monmouth, 201 N.J. 5, 6 (2010);  motor vehicle recordings from mobile video recorders in police vehicles, Paff v. Ocean Cnty. Prosecutor's Office, ___ N.J. Super. ___, ___ (App. Div. June 30, 2016) (slip op. at 39-41); and the destination locations of calls placed from government-issued telephones, Livecchia, supra, 421 N.J. Super. at 29.

It is unnecessary for us to determine the full scope of the privacy provision.  However, in considering whether this provision satisfied the requirement for exemption here pursuant to N.J.S.A. 47:1A-9(b), we discern a common thread in these privacy provision cases: the protected information is personal in the sense that it provides identifying information about a person that originates with the individual and is "entrusted" to the government.  We therefore conclude that the basis for withholding the records sought here does not logically fall within this exemption.

G.

We have considered the argument of amici that the application of the Glomar doctrine in federal courts has undermined the overarching goal of ready public access by obstructing judicial scrutiny.  Our review of federal caselaw reveals that any

32

infringement upon the scope of judicial review is attributable to clearly articulated congressional intent rather than inherent flaws in the doctrine itself.

When evaluating a <u>Glomar</u> response, federal courts must "accord 'substantial weight' to the agency's affidavits." <u>Wilner</u>, <u>supra</u>, 592 <u>F.</u>3d at 68 (alterations in original) (quoting <u>Minier</u>, <u>supra</u>, 88 <u>F.</u>3d at 800). This standard of deference has its origin in the 1974 amendments to 5 <u>U.S.C.A.</u> § 552(b)(1) which, Congress made clear, were intended to override the Supreme Court's holding in <u>Environmental Protection Agency v. Mink</u>, 410 <u>U.S.</u> 73, 93 <u>S. Ct.</u> 827, 35 <u>L. Ed.</u> 2d 119 (1973), regarding the in camera review of classified documents. Congress overrode President Ford's veto of the 1974 amendments to FOIA to do so. <u>Military Audit Project v. Casey</u>, 656 <u>F.</u>2d 724, 738 n.47 (D.C. Cir. 1981). The Senate report states:

> [T]he Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record. <u>Accordingly, the conferees expect that Federal courts, in making de novo determinations</u> in section 552(b)(1) cases under the Freedom of Information law, <u>will accord substantial weight to an agency's affidavit</u> concerning the details of the classified status of the disputed record.
>
> [S.Rep.No. 93-1200 (1974), <u>as reprinted in</u>, 1974 U.S.C.C.A.N. 6285, 6290 (emphasis added).]

33

Because no corresponding limitation upon judicial review exists in OPRA or is suggested by the legislative history, our review of Glomar responses will not be burdened by such a directive.

III.

Finally, we turn to NJMG's argument that the denial of access here violated its common law right to access. OPRA explicitly does not "limit[] the common law right of access to a government record, including criminal investigatory records of a law enforcement agency." N.J.S.A. 47:1A-8; see also N.J.S.A. 47:1A-1. The definition of a public record under the common law[7] is broader than that contained in OPRA. Bergen Cnty. Improvement Auth. v. N. Jersey Media Grp., Inc., 370 N.J. Super. 504, 509-10 (App. Div.), certif. denied, 182 N.J. 143 (2004). However, the right to access common law records is a qualified one, Newark Morning Ledger, supra, 423 N.J. Super. at 171, and the showing a requestor must make to gain access is greater than that required under OPRA. Mason, supra, 196 N.J. at 67-68.

In Keddie, the Supreme Court identified three predicates for the common law right to access public records: "(1) the records

_____

[7]  Under common law, a government record "is one that is made by a public official in the exercise of his or her public function, either because the record was required or directed by law to be made or kept, or because it was filed in a public office." Keddie v. Rutgers, 148 N.J. 36, 49 (1997).

must be common law public documents; (2) the person seeking access must 'establish an interest in the subject matter of the material'; and (3) the citizen's right to access 'must be balanced against the State's interest in preventing disclosure.'" 148 N.J. at 50 (citations omitted).

The trial court here found the first two Keddie requirements satisfied, a conclusion BCPO does not challenge on appeal. NJMG's primary challenge to the trial court's analysis is that, because BCPO declined to confirm or deny the existence of responsive records, there was no factual record to support the trial judge's conclusions. We disagree.

After making the determinations required by Keddie, "a court must balance the plaintiff's interest in the information against the public interest in confidentiality of the documents, including a consideration of whether the 'demand for inspection is premised upon a purpose [that] tends to advance or further a wholesome public interest or a legitimate private interest.'" S. N.J. Newspapers, Inc. v. Twp. of Mt. Laurel, 141 N.J. 56, 72 (1995) (alteration in original) (citation omitted). The balancing required calls for consideration of:

> (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities

35

would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decision making will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.

[Loigman, supra, 102 N.J. at 113.]

These factors are largely irrelevant here. The nature of the records sought and the response given by BCPO call for flexibility in the balancing process employed. See Atl. City Convention Ctr. Auth. v. S. Jersey Publ. Co., 135 N.J. 53, 60 (1994) (citation omitted) (noting the balancing process is "flexible and adaptable to different circumstances and sensitive to the fact that the requirements of confidentiality are greater in some situations than in others").

NJMG's argument that the record is insufficient because BCPO has not certified to facts that would warrant non-disclosure ignores the context its OPRA request gave to the analysis. "In furtherance of the newsgathering process," NJMG sought reports "filed against or involving" A.B.C., "complaints . . . made to law enforcement officials concerning" A.B.C., and "[r]ecordings . . . of 911 calls . . . related to" A.B.C. The unmistakable import of

36

the request was to seek records regarding criminal allegations against A.B.C. BCPO's refusal to confirm or deny the existence of such records directly responded to that request, noting the request was one for records relating to a person who was not arrested or charged with an offense. Such information has been long acknowledged to enjoy a high degree of confidentiality.

It is obvious that, in order to protect the confidentiality of persons who have been the subject of investigation but not charged with any offense, the prosecutor must respond to requests for such records uniformly. To deny records exist in some cases and to issue no denial in others would implicitly confirm the existence of records in a particular case, entirely defeating any effort to protect the confidentiality interest at stake. See Daily Journal v. Police Dept. of City of Vineland, 351 N.J. Super. 110, 128-29 (App. Div.) (citation omitted) (stating disclosure of the names of individuals mentioned in grand jury presentment would be "tantamount to an accusation" without "furnish[ing a] forum for a denial," depriving the individual of "the right to answer and to appeal"), certif. denied, 174 N.J. 364 (2002). The record here was sufficient to identify the issue joined by the request and the response and permit a determination as to whether access was required by the common law.

Where "reasons for maintaining a high degree of confidentiality in the public records are present, even when the citizen asserts a public interest in the information, more than [the] citizen's status and good faith are necessary to call for production of the documents." Loigman, supra, 102 N.J. at 105-06. That high degree of confidentiality applies here. After considering the arguments advanced by NJMG, we conclude the common law right of access did not require BCPO to disclose whether or not records responsive to its request existed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

38