OPINION OF THE COURT
Peter H. Moulton, J.
In this CPLR article 78 proceeding petitioner Samir Hashmi seeks to obtain records from the New York City Police Department (NYPD) pursuant to the state’s Freedom of Information Law (Public Officers Law § 84 et seq. [commonly referred to as FOIL]). The records sought in Hashmi’s October 2012 FOIL request pertain to alleged surveillance and investigation by the NYPD of Hashmi, and of the Rutgers University Muslim Student Association where he served as treasurer while enrolled as a student at Rutgers. The request was prompted by a series of newspaper articles by the Associated Press that concerned NYPD surveillance of various Muslim individuals, groups and mosques in New York, New Jersey and Connecticut.
The NYPD responded to Hashmi’s FOIL request by refusing to state whether or not it had records in its possession responsive to the request. According to the NYPD, the mere disclosure of the existence of such documents would “cause substantial harm to the integrity and efficacy of NYPD’s investigations of terrorist activities and could endanger the safety of people working undercover, or who otherwise provide information to the NYPD.”[1]
Information that might disclose non-routine law enforcement techniques, or reveal the identities of undercover operatives or others providing confidential information to the police, are types of documents that are specifically exempt from FOIL disclosure. (See Public Officers Law § 87 [2] [e] [iii], [iv].) However, in order to invoke these and other exemptions, FOIL provides that a law enforcement agency must first acknowledge the existence of responsive documents. Frequently, it is necessary for a court to conduct an in camera inspection of responsive documents for which an exemption is claimed in order to determine whether the agency has properly invoked that exemption.
Here, the NYPD seeks to avoid that process on the ground that its mere acknowledgment of the existence of the documents sought by Hashmi would impair its ability to combat terrorism, even if the content of the documents would be exempt from disclosure under exceptions set forth in FOIL.
*714 In making this argument, the NYPD asks this court to adopt the Glomar doctrine, a common-law exception to disclosure that federal courts have engrafted onto the Federal Freedom of Information Act (5 USC § 552 [commonly referred to as FOIA]). The Glomar doctrine was first adopted in two cases involving FOIA requests that sought information about the Central Intelligence Agency’s (CIA) use of Howard Hughes’ salvage ship the “Glomar Explorer” in recovering a Soviet nuclear submarine. In Phillippi v Central Intelligence Agency (546 F2d 1009 [DC Cir 1976]) and Military Audit Project v Casey (656 F2d 724 [DC Cir 1981]), the District of Columbia Circuit Court allowed the CIA and Department of Defense to neither confirm nor deny the existence of documents involving the use of the Glomar Explorer.
Before the court is respondents’ motion to dismiss the petition. As discussed at greater length below, respondents argue that this court should adopt the Federal Glomar doctrine in evaluating Hashmi’s FOIL request and let stand the NYPD’s denial of petitioner’s request.
Background
In a series of articles in 2011-2012, the Associated Press revealed that the NYPD had engaged in extensive surveillance of Muslims, including Muslim university and college students, in New York, New Jersey, and Connecticut. The articles stated that Rutgers University was one of the schools where Muslim students were subject to NYPD surveillance.[2]
Hashmi alleges that he was a student at Rutgers University from 2006 to 2011. He alleges that as a member of the Rutgers Muslim Student Association, he condemned terrorism while raising awareness about Islam. He contends that he has never been charged with a crime, and has done nothing to warrant surveillance by the NYPD. There is nothing in the record before the court that contradicts those statements. Hashmi asserts in *715 his affidavit that the NYPD “spied” on him “for no basis except that I am a Muslim.”[3]
Hashmi submitted his FOIL request to the NYPD on October 23, 2012. He sought seven overlapping categories of documents:
“1. All records related to any investigation of Samir Hashmi, between 2006-2012, including the results of those investigations.
“2. All records related to Samir Hashmi relied upon by the NYPD that led to any report being filed.
“3. All records related to the surveillance of Samir Hashmi by the NYPD.
“4. All records related and relied upon on the surveillance [sic] of Samir Hashmi used by the NYPD.
“5. All directives and/or memoranda sent or received by the NYPD related to surveillance of Samir Hashmi from 2006-2012.
“6. All directives and/or memoranda sent or received by the NYPD related to surveillance of the Rutgers Muslim Student Associations from 2006-2012.
“7. All directives and/or memoranda sent or received by the NYPD related to the surveillance of Samir Hashmi, as Treasurer for Rutgers Muslim Student Association from 2006-2009.”
In a letter dated November 13, 2012, a NYPD records access officer acknowledged receipt of Hashmi’s request, and estimated that the department would respond in 20 business days.
More than six months later, the NYPD denied Hashmi’s request in a letter dated June 28, 2013. The letter stated that Hashmi’s request did not include a certification of Hashmi’s identity. The NYPD also noted that Hashmi had not consented to the release of his records to his attorney.
The NYPD’s denial went on to state that even if Hashmi’s request had been accompanied by a certification of identity, the information sought was “on its face, information that is exempt from FOIL disclosure.” The denial explicitly did not admit that records responsive to Hashmi’s request were in the NYPD’s possession. Instead, the denial stated conditionally that if such records were in the NYPD’s possession they would be protected by several FOIL exemptions set forth in the denial:
*716 “1. Disclosure of the records would interfere with law enforcement investigations or pending judicial proceedings. POL § 87 (2) (e) (i).
“2. Disclosure of the records would identify a confidential source or confidential information relating to a criminal investigation. POL § 87 (2) (e) (iii).
“3. Disclosure of the records would reveal non-routine criminal investigative techniques or procedures. POL § 87 (2) (e) (iv).
“4. Disclosure of the records would endanger the life or safety of any person. POL § 87 (2) (f).
“5. Disclosure of the records would constitute an unwarranted invasion of privacy. POL §§ 87 (2) (b), 89 (2) (b).
“6. Disclosure of the records would reveal protected pre-decisional inter-agency or intra-agency materials. POL § 87 (2) (g).
“7. Disclosure of the records would violate state or federal statutes that specifically exempt such documents from disclosure. POL § 87 (2) (a).”
Hashmi took an administrative appeal of the NYPD’s denial. In a letter dated August 7, 2013, the Records Access Appeals Officer denied the appeal. The August 7th letter reiterated the objection that Hashmi’s identity had not been properly certified in the request. It also stated that the records requested had not been properly identified “in a matter that would evoke a path that could lead to the retrieval of responsive records with reasonable efforts.” The denial letter faulted, inter alia, the breadth of the records sought, and Hashmi’s failure to identify the NYPD unit that may have been involved in the alleged surveillance.
The NYPD’s primary reason for the denial was that the records sought, if they existed, would be exempt from disclosure under the FOIL provisions cited by the Records Access Appeals Officer that are set forth above. Consistent with its position in the instant motion to dismiss, the NYPD did not state whether or not it had any documents responsive to the request.
As these administrative challenges progressed, the NYPD’s Muslim surveillance program became an issue in the 2013 mayoral race and media outlets carried stories concerning the *717 candidates’ positions with respect to the program.[4] After his election, Mayor Bill de Blasio disbanded the NYPD unit that conducted the surveillance.[5]
Hashmi brought this article 78 proceeding to challenge the NYPD’s denial of his FOIL request. Respondents moved to dismiss the petition. That motion is now before the court.
Discussion
A. New York State’s Freedom of Information Law
The purpose of the Freedom of Information Law is to further governmental transparency and protect the public’s right to know. Accordingly, any FOIL exemptions are interpreted narrowly. (See Matter of Markowitz v Serio, 11 NY3d 43, 51 [2008].) FOIL imposes a broad duty of disclosure upon government agencies. Government records are “presumptively open” to the public, statutory exemptions to disclosure are “narrowly construed,” and the agency must articulate a “particularized and specific justification” for nondisclosure. (Matter of New York Civ. Liberties Union v City of Schenectady, 2 NY3d 657, 661 [2004], citing Matter of Gould v New York City Police Dept., 89 NY2d 267, 274-275 [1996].)
The “narrowly constructed” categories of FOIL exemptions are collected at Public Officers Law §§ 87 (2), 89 (2). (Matter of Fink v Lefkowitz, 47 NY2d 567, 571 [1979].) The burden on proving any exemption rests with the respondent agency. (Markowitz at 50-51.) If a court is unable to determine from the parties’ papers whether withheld documents fall within the claimed exemptions, it must conduct its own inspection of the withheld documents in camera and order disclosure of any nonexempt, appropriately redacted material. (Matter of Xerox Corp. v Town of Webster, 65 NY2d 131, 133 [1985].)
B. The Federal Freedom of Information Act and the Glomar Doctrine
In general, FOIA’s procedures are similar to FOIL’s: an individual or entity submits requests to a government agency and *718 receives one of three responses. First, the agency may identify responsive records and release them. Second, it may determine that there are no responsive records and inform the requester of that fact. Third, it may identify responsive records but determine that all or part of the records are exempt from disclosure under one of FOIA’s nine statutory exemptions, which are listed below. If an agency denies a FOIA request, there is the opportunity for administrative and then judicial review of the denial. In litigation, the defendant agency is typically required to provide the plaintiff requester with a detailed affidavit, called a Vaughn index,[6] which describes the contents of each withheld document (while shielding exempt information) and explaining the statutory basis for its exemption. The Vaughn index thus provides the plaintiff requester with some information to contest the agency’s basis for withholding documents or portions of documents, and allows the agency to carry its burden of proof. In camera inspection of the documents in question is often necessary to determine the validity of the claimed exemptions.
The Glomar doctrine allows an agency to depart from this usual procedure. As noted above, the Glomar doctrine has as its premise that the existence or nonexistence of documents is itself a fact protected by the exemptions to disclosure stated in FOIA, the federal analog of FOIL. A federal agency may issue a Glomar response if an answer to a FOIA inquiry confirming or denying the existence of responsive documents would cause the harm cognizable under a FOIA exemption. (See Center for Constitutional Rights v Central Intelligence Agency, 765 F3d 161, 164 n 5 [2d Cir 2014].)
Because the agency does not wish to acknowledge the existence of the requested documents, it does not prepare a Vaughn index. For the same reason there is no in camera inspection of documents by the court—since the agency’s position is that the documents may or may not exist. Instead the agency meets its burden by submitting an affidavit showing that the requested material, if it exists, logically would fall within the claimed exemptions. The affidavit must also set forth the harm that would ensue from merely acknowledging the existence of the requested records. (Wilner v National Sec. Agency, 592 F3d 60, 68 [2d Cir 2009].) When an agency asserts a Glomar response, the discussion of exemption is more abstract, and not anchored *719 to any particular document. Because of the alleged sensitivity of the request, sometimes the agency’s affidavits are submitted to the court in camera, which of course gives the plaintiff no chance to respond. (Nathan Freed Wessler, Note, “[We] Can Neither Confirm Nor Deny the Existence or Nonexistence of Your Request”: Reforming the Glomar Response Under FOIA, 85 NYU L Rev 1381, 1391 [2010].) The reviewing court must accord “substantial weight” to the agency’s affidavit(s). (Wilner at 68.)
A Glomar response must be “tether[ed]” to one of the nine FOIA exemptions. (Id.) Those exemptions are set forth at 5 USC § 552 (b):
“(b) This section does not apply to matters that are—
“(1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;
“(2) related solely to the internal personnel rules and practices of an agency;
“(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—
“(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
“(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
“(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.
“(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
“(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
“(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;
*720 “(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;
“(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or
“(9) geological and geophysical information and data, including maps, concerning wells.”
Section 552 (b) goes on to state that an agency should redact exempt information if it is “reasonably segregable” and produce the redacted document(s).
C. The NYPD’s Proposal to Engraft the Glomar Doctrine into FOIL
The NYPD argues that it must have the option of submitting a Glomar response to certain types of requests. Otherwise, the existence of its surveillance and other anti-terrorist strategies will be revealed and therefore undermined. While it would appear that details concerning surveillance techniques and strategies would almost certainly fall under one of FOIL’S law enforcement exemptions, and that therefore the content of those *721 techniques and strategies—and the identities of undercover agents—would not be revealed, the NYPD asserts that it would be harmful to go through the usual FOIL procedure of vetting the claimed exemption. According to the NYPD, the mere acknowledgment of documents concerning surveillance would reveal the targets and scope of its anti-terrorism surveillance operations. Individuals and entities could know whether or not they are the subject of surveillance and adjust their activities accordingly.
The NYPD also correctly points out that the Glomar doctrine is effective only where whole categories of requests receive Glomar responses, whether or not there are actually documents responsive to those categories of requests. For example, the doctrine is not effective if it is only invoked where there has been surveillance of the person or entity requesting information. Were the NYPD to invoke the Glomar doctrine only when it had responsive records that it wanted to conceal, and give a “no record” response when it had no such records (or a Vaughn index when it was willing to at least acknowledge exempt records), then requesters would see a Glomar response as nothing more than a governmental admission that records exist which the government wants to cover up.
The NYPD emphasizes the urgency of its anti-terrorism initiatives by stating the undeniable fact that New York City is a terrorist target. Two lethal attacks on the World Trade Center, and other thwarted acts of terrorism have confirmed that grim reality. The NYPD submits the affidavit of Thomas Galati, who is the Chief of Intelligence of the NYPD’s Intelligence Bureau. Chief Galati points to 27 terrorist plots that law enforcement has disrupted since September 11, 2001. The NYPD argues that the individuals engaged in those plots could have found out if they were under surveillance by submitting a FOIL request. A response, even one that asserted an exemption that would suppress any detail about the surveillance, would still notify the individuals that they were being watched, and then cause them to alter their behavior to evade detection. The NYPD does not state whether it is aware of any instance of this use of FOIL by terrorists.
Of course, the surveillance of Muslims by law enforcement in the United States has long been acknowledged in the press, which would appear to provide ample notice to potential terrorists. The specific program that gave rise to Hashmi’s FOIL *722 request has been a particular focus of press attention.[7] To meet that argument, the NYPD argues that agency acknowledgment of exempt materials can still inflict harm, and points out that federal courts have held that there is no waiver of a Glomar response when the press, or even another federal agency or branch of government, reveals information that a defendant agency holds as too sensitive to reveal. (E.g. Wilner, 592 F3d at 70; Frugone v Central Intelligence Agency, 169 F3d 772 [DC Cir 1999]; Hunt v Central Intelligence Agency, 981 F2d 1116 [9th Cir 1992].) Only where senior executive branch officials, or an agency itself, publicly acknowledge the existence of requested documents can a Glomar response be defeated. (See New York Times Co. v. United States Dept. of Justice, 762 F3d 233 [2d Cir 2014].) However this “public acknowledgment” attack on a Glomar response has historically seen little success in federal court. (See Michael D. Becker, Comment, Piercing Glomar: Using the Freedom of Information Act and the Official Acknowledgment Doctrine to Keep Government Secrecy in Check, 64 Admin L Rev Am U 673 [2012].)
The NYPD urges this court to adopt Glomar—-just as federal courts have—essentially as a common-law amendment to a statutory scheme. It argues that just as Congress has never deemed it necessary to codify Glomar in FOIA, there is no prerequisite that the state legislature do so in FOIL.
For the reasons stated below, the court disagrees and declines to adopt Glomar. The adoption would effect a profound change to a statutory scheme that has been finely calibrated by the legislature. Therefore, the decision to adopt the Glomar doctrine is one better left to the state legislature, not to the judiciary.
The insertion of the Glomar doctrine into FOIL would build an impregnable wall against disclosure of any information concerning the NYPD’s anti-terrorism activities. The wall would be created by the procedures used to vet a Glomar response, outlined above, which ensure that the decision to approve or deny a Glomar response is made with very little information, *723 and with almost no useftd input from the person or entity seeking the documents. A Glomar response virtually stifles an adversary proceeding.
Additionally, the Glomar doctrine has been shaped by more than 30 years of judicial precedent. It may be that the state legislature would not choose to adopt wholesale that body of law. For example, the NYPD has indicated in its papers and at oral argument that it seeks a Glomar doctrine in state law that mimics the federal court’s very limited view of the “public acknowledgment” waiver. As noted above, under FOIA, an agency, or the executive, must publicly acknowledge the existence of responsive documents before a Glomar response can be defeated. Under this very narrow “public acknowledgment” doctrine, press reports and even governmental statements acknowledging the existence of a given program are not sufficient to effect waiver of a Glomar response. Therefore, the extensive press reports—and book—about the Muslim surveillance program, the mayoral candidates’ reactions to the program, and Mayor de Blasio’s well-publicized decision to disband the NYPD unit that had conducted the surveillance all would be no impediment to the NYPD stating that it cannot confirm nor deny the existence of documents concerning the program. The legislature might strike a different balance on the question of waiver. Unlike a court, the legislature is not limited to the record presented by parties to a lawsuit.
Differences in the statutory exemptions listed in FOIA and FOIL also raise questions as to whether a judge should engraft the federal doctrine onto the state statute. In the vast majority of Glomar cases, the invocation of the doctrine is tethered to FOIA exemptions (1) and (3). FOIA exemption (1) protects “classified documents” designated by “Executive order.” (5 USC § 552 [b] [1].) Municipal governance does not include an analogous category of documents. FOIA exemption (3) relates to documents “specifically exempted from disclosure by statute.” (5 USC § 552 [b] [3].) FOIA exemption (3) is most often used in Glomar responses in conjunction with legislation that created the federal government’s national security apparatus. For example, two statutes frequently invoked in conjunction with exemption (3) in Glomar responses are the National Security Act of 1947, which exempts from disclosure “intelligence sources and methods” (50 USC § 3024 [i] [1]), and the Central Intelligence Agency Act of 1949, which requires the CIA director to protect intelligence sources or methods. These types of documents have no analogs in the NYPD’s own records.
*724 Federal decisions exist that tether a Glomar response to FOIA exemption (7), which does have an analog in FOIL’S law enforcement exemptions. (See e.g. People for the Ethical Treatment of Animals v National Inst. of Health, Dept. of Health & Human Servs., 745 F3d 535 [2014]; Platsky v National Sec. Agency, 547 Fed Appx 81 [2013].) However, the fact that the Glomar doctrine has arisen, and has been shaped, by the federal government’s preeminent role in “national defense [and] foreign policy” (5 USC § 552 [b] [1] [A]) casts doubt on whether a judge should apply the doctrine to the NYPD.
Finally, there is nothing in the record before the court that indicates the NYPD’s work has been compromised by its inability to assert a Glomar response. To the contrary, case law demonstrates that the NYPD has been able to protect sensitive information very well within the existing procedures that FOIL currently provides. (See e.g. Matter of Bellamy v New York City Police Dept., 87 AD3d 874 [1st Dept 2011]; Matter of Legal Aid Socy. v New York City Police Dept., 274 AD2d 207 [1st Dept 2000]; Asian Am. Legal Defense & Educ. Fund v New York City Police Dept., 41 Misc 3d 471 [2013]; Matter of Urban Justice Ctr. v New York Police Dept., 2010 NY Misc LEXIS 4258 [Sup Ct, NY County 2010].) Crucially, these existing procedures provide some modicum of oversight by allowing the requester to formulate arguments in opposition to a claim of exemption, and by allowing a court to actually view responsive documents to ensure they fall within an exemption.[8]
Since the September 11 attacks, the NYPD has worked tirelessly in protecting New York City. This court’s decision does not reflect any judgment of the NYPD’s work. The court is instead concerned with oversight of governmental functions as embodied by FOIL. The legislature created FOIL to give New York’s citizens some insight into the functioning of their government. In doing so, it set up safeguards to protect against the disclosure of documents that could interfere with the proper operation of law enforcement. Engrafting the Glomar doctrine onto FOIL would change this balance between the need for disclosure and the need for secrecy. Secrecy is a necessary tool that can be used legitimately by government for law enforcement and national security, but also illegitimately to shield il *725 legal or embarrassing activity from public view. It is a legislative function to write a statute that strikes a balance embodying society’s values.
Conclusion
For the reasons stated, respondents’ motion to dismiss is denied. Respondents shall answer the petition pursuant to CPLR 7804 (f).

. Respondents’ mem of law in support of motion to dismiss at 6.

. E.g. Chris Hawley, NYPD Monitored Muslim, Students All Over Northeast, Associated Press, Feb. 18, 2012, available at http://www.ap.org/Content/ AP-In-The-News/2012/NYPD-monitored-Muslim-students-all-over-Northeast. The AP reporters expanded their work into a book. (Matt Apuzzo and Adam Goldman, Enemies Within: Inside the NYPD’s Secret Spying Unit and Bin Laden’s Final Plot Against America [2013].)

. Aff of Samir Hashmi, Mar. 25, 2014, ¶ 19.

. E.g. Matt Taylor, Would a Democratic Mayor End the NYPD’s Muslim-Surveillance Program?, NY Mag, Sept. 9, 2013, available at http://nymag.com/ daily/intelligencer/2013/09/would-a-democrat-mayor-end-muslimsurveillance.html.

. E.g. Matt Apuzzo and Joseph Goldstein, New York Drops Unit That Spied on Muslims, NY Times, Apr. 15, 2014, available at http:// www.nytimes.com/2014/04/16/nyregion/police-unit-that-spied-on-muslims-isdisbanded.html.

. Named for Vaughn v Rosen, 484 F2d 820 (DC Cir 1973).

. E.g. Matt Apuzzo and Adam Goldman, With CIA Help, NYPD Moves Covertly in Muslim Areas, Associated Press, Aug. 23, 2011, available at http:// www. ap. org/Content/AP-In-The-News/2011/With-CIA-help-NYPD -moves-covertly-in-Muslim-areas; Adam Goldman and Matt Apuzzo, Informant: NYPD Paid Me to ‘Bait’ Muslims, Associated Press, Oct. 23, 2012, available at http:// www.ap.org/content/ap-in-the-news/2012/informant-nypd-paid-me-to-baitmuslims.

. For the reasons stated in this opinion, this court is not persuaded by Abdur-Rashid v New York City Police Dept. (45 Misc 3d 888 [2014]), which was recently decided in New York State Supreme Court.