WILSON, J. (concurring in part and dissenting in part).
We have not before been asked whether a governmental agency may, in response to a Freedom of Information Law (Public Officers Law art 6 [FOIL] ) request, decline to confirm or deny the existence of documents. All of us agree that FOIL expresses New York's strong policy command that, subject to limited exceptions, government documents must be made available to the public; that FOIL differs from and is more powerful than FOIA ( 5 USC § 552 ), and that the public is not permitted to use FOIL to disrupt law enforcement operations. FOIL eschews a police state in which citizens are subject to the secret whims of government, yet recognizes the immense public interest in the effective and faithful enforcement of law. As the majority points out, the dissent's position is unsupportable, because FOIL does not require that an agency state whether documents exist if that disclosure itself would reveal information falling within an exemption. As the dissent explains, the majority's ***240 position, though repeatedly self-described as narrow and pertaining solely to the facts of this case, logically requires that the NYPD-or any other governmental agency charged with law enforcement-should respond to all FOIL requests seeking information about investigations by refusing to state whether any responsive documents exist.
I write separately to explain what the process compelled by FOIL and our prior decisions should be. In this case, that *814 process would result in a partial remittal. I have organized my explanation as follows. **475 First, neither FOIL nor our decisional law interpreting it requires an agency to confirm or deny the existence of protected documents if such confirmation or denial would itself be protected by an exemption. Second, conforming our FOIL doctrine to the FOIA Glomar doctrine is inappropriate, because of the unique foreign policy concerns underlying the Glomar doctrine and the criticism of federal decisions expanding that doctrine into more mundane areas. Third, agencies must evaluate the specific terms of each FOIL request and, if appropriate, make partial responses differentiated by the scope of the request and the nature of documents the agency possesses. Fourth, the procedural safeguards proffered by the NYPD, along with some additional safeguards, should be part of the CPLR Article 78 process when a FOIL applicant seeks to challenge an agency's refusal to confirm or deny the existence of records on the ground that the act of doing so would itself disclose protected information.Fifth, the evidence tendered here by the NYPD is not sufficient to meet its prima facie burden to justify its wholesale nonresponse or to overcome the objections raised by the petitioners. Although that evidence is presently insufficient, I would remit to Supreme Court to give the parties the opportunity to present evidence in line with the process and guidelines I suggest.
I.
I begin with FOIL's language. Within five business days of receiving a written request for records, an agency "[i] shall make such record available to the person requesting it, [ii] deny such request in writing or [iii] furnish a written acknowledgement of the receipt of such request and a statement of the approximate date ... when such request will be granted or denied." ( Public Officers Law § 89[3][a] ). The statutory language authorizing denial of a request does not require the agency to offer any reason for the denial at this stage. Thus, at this initial stage an agency is permitted merely to deny a ***241 request, without explanation-and certainly without any requirement to state whether such documents do or do not exist.
As a second step, any person whose request is denied may take an administrative appeal to the agency's director or her designee, who then has ten business days to provide the responsive records or "fully explain in writing to the person requesting the record the reasons for further denial" ( id. § 89[4][a] ). The statute does not state that the "full explanation" must identify any particular document's existence, or the existence of responsive documents at all. Thus, if the response to a request would itself reveal exempt information, the "full explanation" could state only that. For example, § 87(2)(h) exempts "examination questions or answers which are requested prior to the final administration of such questions." In anticipation of sitting for a police officer examination, I might lodge a FOIL request asking for all documents concerning any questions on the forthcoming test that relate to this court's DeBour factors. Confirming that such documents exist would tell me that I should study those factors; confirming that they do not exist would tell me not to bother. I might serve hundreds of similar requests which, if answered, would give me a very good idea of the test's composition. A satisfactory "full response in writing" to my request would be that the request seeks to compromise the test, and without confirming or denying whether any such documents exist, if they did they would be exempt from disclosure. But if I asked the same questions for a test given in the *815 1970s, that response would be patently unsatisfactory. **476 As a third step, a person displeased with the result of the second step (or whose administrative appeal is not timely resolved) may commence an Article 78 petition in Supreme Court ( id. § 89[4][b] ). In that proceeding, the agency "shall have the burden of proving that such record falls within the provisions of" one of the exceptions contained in § 87(2) (id. ). That, then, brings us to the question in this case: what does the agency's burden entail when the agency asserts that the acknowledgement of the existence or nonexistence of documents would itself fall within an exception?
The statute is silent as to any requirements specifically pertaining to such an Article 78 challenge. Although FOIL's process requires agencies to explain why any records they withhold are be exempt from disclosure, no provision in the statute ***242 requires those agencies in possession of responsive but exempt documents to disclose the existence of those documents in every case. Instead, the statute contemplates a spectrum of increasingly circumscribed, and increasingly difficult to justify, responses. To be sure, FOIL's goal of extending public accountability "wherever and whenever feasible" requires agencies to disclose as much information as is not protected by an exemption (id. § 84); exemptions are to be applied only to the relevant "records or portions thereof" and requests are to be "granted ... in part" whenever possible (id. §§ 87 [2]; 89 [3] [a] ). Thus, if an agency establishes a responsive document contains protected information, it will be "required to prepare a redacted version" ( Data Tree, LLC v. Romaine, 9 N.Y.3d 454, 464, 849 N.Y.S.2d 489, 880 N.E.2d 10 [2007] ). If no sufficient redaction is possible, it will be permitted to instead provide a list "enumerating or describing ... the documents withheld" ( Matter of Rose v. Albany County Dist. Attorney's Off., 111 A.D.3d 1123, 1126, 975 N.Y.S.2d 258 [3d Dept. 2013] ; see West Harlem Bus. Grp. v. Empire State Dev. Corp., 13 N.Y.3d 882, 885, 893 N.Y.S.2d 825, 921 N.E.2d 592 [2009] [calling "conclusory characterizations" "insufficient"]; Cirale v. 80 Pine St. Corp., 35 N.Y.2d 113, 119, 359 N.Y.S.2d 1, 316 N.E.2d 301 [1974] [requiring agencies, in the context of the common-law privilege for official information but with an eye toward the recently passed FOIL, to provide a "description of the material sought, the purpose for which it was gathered and other similar considerations" when invoking an exception] ). By extension, if an agency establishes that enumeration would divulge protected information, it may acknowledge the existence of, but choose not to in any way describe, the withheld documents (see American Civil Liberties Union v. C.I.A., 710 F.3d 422, 433 [D.C. Cir.2013] ). In the "rare case" (majority op. at 233, 76 N.Y.S.3d at 469-70, 100 N.E.3d at 808-09) where an agency establishes that even acknowledging the existence of responsive documents would divulge information protected by any one of the FOIL exemptions, it may provide an evidentiary basis for its conclusion while refusing to admit or deny the existence of any requested documents.
II.
The majority's reliance on the federal Glomar doctrine is misplaced. Yes, FOIL was structurally modeled on FOIA. However, as the dissent explains, the Glomar doctrine arises not from FOIA's law enforcement exemption, but from FOIA's exemption of documents "specifically authorized under criteria ***243 established by an *816 Executive order to be kept secret in the interest of national defense or foreign policy" ( 5 USC § 552 [b] [1] [A] ), which has no analog in FOIL. The Constitution arrogates **477 national defense and foreign policy to the federal government; the NYPD is not searching for a lost Soviet submarine or worried about the foreign policy consequences thereof. Both the majority and dissent tar their FOIL analysis by referring to the NYPD's response as a "Glomar" response.
Glomar's peculiar history has had a profound effect on its logic. FOIA Exemptions 1 and 3, together with certain national security-related statutes, create a "near-blanket ... exemption" for properly classified materials and CIA records ( Minier v. Cent. Intelligence Agency, 88 F.3d 796, 801 [9th Cir.1996] ). The exemptions' near-blanket nature opens the door to the federal judiciary's hands-off approach. The national security-related content of FOIA exceptions 1 and 3, coupled with a sense of the uniquely executive purview of national security, pushes judges through it: federal courts consistently reaffirm their "deferential posture" in Glomar cases ( Larson v. Dep't of State, 565 F.3d 857, 865 [D.C. Cir.2009] ). By way of example, the U.S. Court of Appeals for the D.C. Circuit believes that it is "in an extremely poor position to second-guess the predictive judgments made by the government's intelligence agencies regarding questions such as whether a country's changed political climate has yet neutralized the risk of harm to national security posed by disclosing particular intelligence sources" ( id. [internal quotation marks omitted] ).
The federal courts' routine deference to Glomar responses "has been justified on both constitutional and prudential separation of powers grounds: Courts opine that protection of national security information is entrusted to the executive under Article II of the Constitution and that courts lack the competence to assess executive determinations to withhold national security information" (Nathan Freed Wessler, "[ We] Can Neither Confirm Nor Deny the Existence or Nonexistence of Records Responsive to Your Request": Reforming the Glomar Response Under FOIA, 85 NYU L Rev 1381, 1398 [2010] ). It has also been criticized for resting on "concerns about comparative competence [that] are overblown and are outweighed by the institutional conflict of interest that arises when the executive branch makes essentially unreviewed decisions to withhold its own records from disclosure" (id. )
Those foreign-policy insecurities have no place in New York State's excellent unified court system. Our government ***244 features neither a unitary executive tasked with the national defense nor an elaborate system of classified information to which courts routinely defer. Most CIA endeavors will never see the light of day, let alone that of a courthouse; the destiny of every successful NYPD investigation is to appear before a judge. Regardless of federal courts' competence to evaluate foreign countries' changing political climates, we are not similarly handicapped in judging the soundness of FOIL exemptions based on police, privacy, or other justifications. Our courts are fully capable of scrutinizing an agency's response ''on a case-by-case basis to ensure it is warranted under the particular circumstances presented" (majority op. at 234, 76 N.Y.S.3d at 470, 100 N.E.3d at 809).
III.
Glomar aside, both the majority and the dissent come to what I view as unsound resolutions because they fail to consider two important propositions. First, the scope of a particular FOIL request affects the appropriateness of a response refusing *817 to admit or deny the existence of documents. Second, an agency, in responding to a FOIL request, may not be able to make a single response that is appropriate **478 for all the information sought by the request.
Consider two requests: (1) all documents the NYPD possesses concerning any investigation of me; (2) all documents the NYPD possesses concerning any female undercover officer present at the XYZ bar on the evening of February 27, 2018. FOIL requires a different agency response to these two requests, and the former requires far more proof than the latter to justify a refusal to admit or deny the existence of documents. In the case of the latter request, the request facially is to determine the identity of an undercover officer or the existence of an ongoing investigation, and no extrinsic proof should be required to justify the NYPD's refusal to admit or deny the existence of documents. The dissent's absolutist position would require the NYPD to respond that documents do (or do not), exist, which is neither required by FOIL nor responsible public policy.
On the other hand, the majority's treatment of Mr. Abdur-Rashid's request-which is very much like request (1) above-prompts the dissent's salvo at the expansive implications of the majority's writing, allowing the NYPD to "claim the right to refuse to confirm or deny the existence of any record that even tangentially relates to any past, present, or future investigation of 'crime,' thereby avoiding its FOIL obligations in innumerable ***245 cases" (dissenting op. at 266, 76 N.Y.S.3d at 494, 100 N.E.3d at 833).[1] If the NYPD has in its possession documents from its surveillance of Mr. Abdur-Rashid in 1993, when he attended the Parliament of World Religions in Chicago, the majority has exempted the NYPD from saying whether it has such documents.
Neither the majority nor the dissent acknowledges that, in the case of a broad request such as (1) above, the agency is not entitled to give a monolithic response, and cannot give any response without examining the documents in its possession, if any. That is, FOIL expressly states that agencies may grant or deny requests "in whole or in part", and a broad request likely calls for a differentiated response, based on the agency's examination of what, if anything, it possesses.
Here, as the dissent notes, the requests seek information about current investigations as well as past investigations. Those two differ in the proof required. As to pending investigations, an agency's refusal to admit or deny the existence of responsive records should require little, if any, proof, because the acknowledgement of the existence of an investigation while it is pending (or being contemplated) is clearly likely to "interfere with law enforcement investigations". However, absent some specific proof that would bring disclosure of the existence of a past investigation within a FOIL exception, documents related to closed matters do not presumptively interfere with law enforcement investigations. Although agnostic on the question, *818 today's decision, if properly implemented, should allow the NYPD categorically to refuse to confirm or deny the existence of records only if those records "involve[ ] an **479 ongoing criminal investigation" or were provided to it under an information-sharing agreement with federal agencies whose records are specifically exempted from disclosure (majority op. at 237, 76 N.Y.S.3d at 471-72, 100 N.E.3d at 810-11). I discuss the application to the facts of this matter in part V. ***246 IV.
I agree with the majority that "our existing FOIL paradigm contains important safeguards against misuse of the exemptions that are no less available in the rare instance when a Glomar-response is asserted" (majority op. at 238, 76 N.Y.S.3d at 472-73, 100 N.E.3d at 812-13).
Chief among those safeguards is the parties', our lower courts', and the majority's recognition that an agency declining to confirm or deny the existence of responsive records must be held to the same standard expected of every agency that denies any part of a FOIL request.[2] To withhold responsive records, or any information about those records (including the fact of their existence or nonexistence), an agency must demonstrate that they, or the information, "fall[ ] squarely within a FOIL exemption by articulating a particularized and specific justification for denying access" ( ***247 Capital Newspapers Div. of Hearst Corp. v. Burns, 67 N.Y.2d 562, 566, 505 N.Y.S.2d 576, 496 N.E.2d 665 [1986] ). Those "exemptions are to be narrowly interpreted so that the public is granted maximum access to the records of government" ( Matter of Data Tree, LLC v. Romaine, 9 N.Y.3d 454, 462, 849 N.Y.S.2d 489, 880 N.E.2d 10 [2007] ). For the same *819 reason, those justifications must present "specific, persuasive evidence" and "cannot merely rest on a speculative conclusion that disclosure might potentially cause **480 harm" ( Markowitz v. Serio, 11 N.Y.3d 43, 50-51, 862 N.Y.S.2d 833, 893 N.E.2d 110 [2008] ). In other words, the NYPD must meet its burden "in more than just a 'plausible fashion' " ( Data Tree, 9 N.Y.3d at 462, 849 N.Y.S.2d 489, 880 N.E.2d 10 ).
Another familiar safeguard is the expectation, shared by the majority, that courts unable to determine whether withheld documents fall entirely within the scope of the asserted exemption will "test the legitimacy of a claim of confidentiality" by ordering an "in camera review of sensitive or confidential materials" (majority op. at 237, 76 N.Y.S.3d at 471-72, 100 N.E.3d at 810-11; see Matter of Gould v. New York City Police Dep't, 89 N.Y.2d 267, 275, 653 N.Y.S.2d 54, 675 N.E.2d 808 [1996] ).[3] "Supreme Court should decide" whether in camera review is necessary on the basis of an agency's submission, regardless of whether the petitioner raises the issue ( New York Times Co. v. City of New York Fire Dep't, 4 N.Y.3d 477, 491, 796 N.Y.S.2d 302, 829 N.E.2d 266 [2005] ; see also Xerox Corp. v. Town of Webster, 65 N.Y.2d 131, 133, 490 N.Y.S.2d 488, 480 N.E.2d 74 [1985] ; Church of Scientology Int'l v. U.S. Dep't of Justice, 30 F.3d 224, 233 [1st Cir.1994] ["The fact that the Church did not request in camera review in no way lessens the government's burden to make an adequate showing ... In other ***248 words, in camera review is a tool available to a court when the government's showing otherwise is inadequate to satisfy the burden of proving the exempt status of withheld documents.... The Church had no obligation to request such a review"] ). The more circumscribed the response, the more necessary the review: in the "rare case"-like this one-where no index of withheld documents can be provided, "it would seem proper that the material requested be examined by the court in camera" ( Cirale, 35 N.Y.2d at 119, 359 N.Y.S.2d 1, 316 N.E.2d 301 ).
A third and final familiar safeguard is the provision, recently augmented by the legislature, for attorney's fees to be awarded to petitioners who substantially prevail over an agency's effort to restrict the freedom of information ( Public Officers Law § 89[4][c][i]-[ii] ). As I understand the majority's logic, agencies refusing to confirm or deny the existence of responsive records first establish an exemption applies to the contents of that record. Then, they rerun their analysis, under the same or another exemption, against the bare *820 fact of the record's existence. Petitioners who prevail over that second iteration of the FOIL provision, even if they do not succeed in accessing the document itself, **481 may be entitled to whatever attorney's fees are attributable to that portion of their effort.
In addition to those familiar safeguards, all parties in this case suggest-and the majority agrees-that further precautions should be adopted in FOIL cases where the agency neither confirms nor denies the existence of responsive records.
First, the "burden is on the agency to submit an affidavit explaining in as much detail as possible why the information protected by [the agency's response]-i.e., whether the agency possesses responsive documents-logically falls within the claimed [FOIL] exemptions" (majority op. at 229, 76 N.Y.S.3d at 467, 100 N.E.3d at 806).
Second, as the NYPD proposes, a petitioner should have the opportunity to test the affidavit by (a) "argu[ing] that the agency's claims are insufficient to show that acknowledging the existence of records implicates an exemption to disclosure" and (b) "producing competent evidence" that rebuts the agency's proffered justification for using a circumscribed response (Resp. Brief at 43-44). To "create as complete as public record as is possible", the petitioner "should be allowed to seek appropriate discovery" ( Phillippi, 546 F.2d at 1013 ).
Third, a petitioner should have the opportunity to challenge the asserted FOIL exemption by advancing "a claim of bad ***249 faith" (majority op. at 237, 76 N.Y.S.3d at 473, 100 N.E.3d at 812). "[T]he mere allegation of bad faith should not undermine the sufficiency of agency submissions" ( Minier v. Cent. Intelligence Agency, 88 F.3d 796, 803 [9th Cir.1996] [internal quotation marks omitted] ). Should a court find that an agency's refusal to disclose information is motivated not by the spirit of the exemption but by some more invidious purpose, the primary remedy is "to review the agency affidavits with greater scrutiny" ( id. ).
Fourth, a petitioner should have the opportunity to establish an exemption to the exemption by demonstrating that the agency "has already revealed the records sought and for which it claims an exemption" (majority op. at 237, 76 N.Y.S.3d at 473, 100 N.E.3d at 812). If so, that agency "cannot credibly support a Glomar-type response" and the court should "compel[ ] [the disclosure of information] over an agency's otherwise valid exemption claim" (id. ; Fitzgibbon v. CIA, 911 F.2d 755, 765 [D.C. Cir.1990] ). Although the long-standing test for whether information has been officially acknowledged by an agency appears quite narrow (see id. ), more recent decisions have compelled disclosure when an agency, or another high-ranking public official, has revealed not the document itself but the information that would otherwise justify withholding the document ( New York Times Co. v. U.S. Dep't of Justice, 756 F.3d 100, 120-121 (2d Cir.2014) ; Am. Civil Liberties Union, 710 F.3d 422, 428-432 [D.C. Cir.2013] ). The world's few Glomar watchers would see the federal courts move still further in that direction (Michael D. Becker, Piercing Glomar: Using the Freedom of Information Act and the Official Acknowledgment Doctrine to Keep Government Secrecy in Check, 64 Admin L Rev 673, 698 [2012] ; Wessler, 85 NYU L Rev at 1414 ).
Moreover, the federal official acknowledgement doctrine is instructive, but-even at its broadest-too narrow for FOIL. As with other concepts borrowed from Glomar cases, its birth "in the arena of intelligence and foreign relations" has stunted its growth ( *821 Fitzgibbon, 911 F.2d at 765 ). In those arenas, "there can be a critical difference between official and unofficial disclosures" ( id. ; see Wilson v. CIA, 586 F.3d 171, 186 [2d Cir.2009] ["Foreign **482 governments can often ignore unofficial disclosure of CIA activities that might be viewed as embarrassing or harmful to their interests(;)... (t)hey cannot, however, so easily cast a blind eye on official disclosures made by the CIA itself"]; Afshar v. Dep't of State, 702 F.2d 1125, 1130-31 [D.C. Cir.1983] ["Unofficial leaks ***250 and public surmise can often be ignored by foreign governments that might perceive themselves to be harmed by disclosure of their cooperation with the CIA, but official acknowledgment may force a government to retaliate"] ). "In the world of international diplomacy, where face-saving may often be as important as substance, official confirmation ... could have an adverse effect on our relations" with other countries ( (Phillippi v. Central Intelligence Agency , 655 F2d 1325, 1332-1333 [DC Cir 1981] ).
The NYPD, however, has no international diplomacy docket. Accordingly, the official acknowledgement doctrine should yield, here, to the broader public domain doctrine (see Chesapeake Bay Found., Inc. v. U.S. Army Corps of Engineers, 722 F.Supp.2d 66, 72 n. 3 [D.D.C. 2010] [refusing to apply the open acknowledgement doctrine in a case involving law enforcement records] ). "Under the public domain doctrine, FOIA-exempt information may not be withheld if it was previously disclosed and preserved in a permanent public record. The plaintiff bears the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." ( id. at 72 [internal quotation marks and brackets omitted] ). If FOIL petitioners can establish that the existence of a document, or the information an agency seeks to protect by refusing to confirm the existence of a document, is already included in a public record, then agencies should have to disclose that information.
Together, these safeguards-as well as others that courts deem appropriate in discharging their obligations to adjudicate FOIL determinations challenged pursuant to Article 78-suffice to protect petitioners from overzealous assertions of an agencies' inability to confirm or deny the existence of records.[4]
V.
Here, the NYPD moved to dismiss petitioners' Article 78 proceeding because it alleged confirming or denying the existence of any records responsive to their requests would cause harms cognizable under FOIL's law enforcement and public safety exemptions ( Public Officers Law § 87[2][e], [f] ). In support ***251 of that contention, it offered a public affidavit from NYPD Chief of Intelligence Thomas Galati. Chief Galati's "22-page affidavit" consists of five pages describing his background and the organization of the NYPD's Intelligence Division, and another seven listing public accounts of apprehending and trying terrorists. The balance avers that "disclosure of whether responsive documents even exist necessarily would reveal whether Petitioner currently is or previously has been the subject of a counter-terrorism investigation." Chief Galati lists four consequences the NYPD seeks to avoid:
*822 1. "The knowledge that a person or group is the subject of a NYPD counter-terrorism investigation **483 would allow that person or group to alter their behavior so as to avoid detection"
2. "Conversely, the knowledge that a person or group is not a subject of investigation would allow such persons to more freely engage in illegal activity"
3. "[A] person who knows he or she is under investigation might scrutinize his or her contacts more carefully and, in doing so, could discern the identity of an undercover police officer or confidential informant working on the case. Not only would this compromise the integrity and value of any information to be learned from such sources, but it could endanger the lives and safety of such sources"
4. "Disclosure of whether a particular individual or group is the subject of investigation would allow those bent on unlawful activity to prepare a roadmap of investigatory operations, decisions, techniques and information that would enable every group to anticipate investigative tactics and activities, and undermine current and future investigations."
In opposing the motion to dismiss, the petitioners argued that Chief Galati's affidavit failed to establish a prima facie case for asserting such a severely circumscribed response. They also argued that, even had the case been established, it would have been defeated by the fact that the information the NYPD sought to protect was already a matter of public record, by the stricter scrutiny turned on agencies that assert FOIL exemptions in bad faith, and by in camera review.
***252 A. The NYPD's Prima Facie Case
As discussed in part III, in response to a FOIL request seeking information about investigations, I would hold that the NYPD has the right to refuse to confirm or deny the existence of documents as to any pending investigation, because such a request facially interferes with a law enforcement investigation.[5] However, the requests here are not limited to present investigations, but include past ones as well. As to those, the NYPD has not carried its burden of articulating a particularized and specific justification for refusing to confirm or deny whether documents responsive to any of petitioners' 22 requests exist.
The first three harms it alleges are premised on the conjecture that individuals-presumably other than Mr. Hashmi and Mr. Abdur-Rashid, whom the record suggests are upstanding citizens-inclined to terrorism or organized crime will FOIL themselves, and then tailor the scope of their activities to either stymie investigators or exploit the discovery that they are not (or were not) under investigation. Chief Galati's affidavit, however, cannot identify ''any instance of this use of FOIL by terrorists'' ( Hashmi v. New York City Police Dep't, 46 Misc.3d 712, 721, 998 N.Y.S.2d 596 [Sup. Ct., N.Y. County 2014] ), nor does it provide any factual basis to conclude that terrorists have used similar information to tailor their activities.
*823 Absent such a statement, let alone the evidence thereof that our probing standard would require, it strains belief that terrorists **484 are self-identifying themselves to the NYPD by filing regular FOIL requests.
Those three harms fail to justify the NYPD's refusal to confirm or deny the existence of past investigations. Contrary to the majority's insistence that the requests were "extremely specific" and related to "a discrete time period immediately preceding the request", many of them were unbounded in time and in type (majority op. at 234, 238, 76 N.Y.S.3d at 470-71, 472-73, 100 N.E.3d at 809-10, 811-12). Petitioners requested, for instance, "[a]ll records related to the surveillance of Imam Talib W. Abdur-Rashid by NYPD", "[a]ll records related to the Mosque of Islamic Brotherhood ... relied upon by the NYPD
***253 that led to any report being filed", and "[a]ll records related to any investigation of Samir Hashmi, between 2006-2012". Chief Galati's affidavit does not suggest that law enforcement purposes or the public safety would be compromised if the agency revealed that it had records from the 1960s pertaining to Mr. Abdur-Rashid or the mosque with which he is now affiliated (see Matter of Lesher v. Hynes, 19 N.Y.3d 57, 945 N.Y.S.2d 214, 968 N.E.2d 451 [2012] ), or to an investigation into noise complaints against Mr. Hashmi's college parties. FOIL's demand that agencies provide in part what records or information they cannot provide in whole should have led the agency to disclose, or Supreme Court to require it to disclose, whether relevant records from a time or of a type that did not trigger the affidavit's concerns existed. The NYPD could readily have accompanied that admission with a statement that it would neither confirm nor deny the existence of any records related to ongoing terrorism investigations.
The fourth harm alleged in Chief Galati's affidavit is more substantial. Acknowledging the existence of records responsive to requests of the kind submitted by these petitioners could, in the aggregate, provide terrorists and other criminals or criminal organizations with a guide to the people and places, or the type of people and places, monitored by the NYPD.
That rationale, however, is subject to the same time and type restrictions as its companions. As to time, there is some point, which the NYPD should have specified or Supreme Court should have determined, prior to which information about the NYPD's historical capabilities, strategies, and operating tactics will cease to provide today's threats with relevant information. A map of NYPD activities around Rutgers may continue to reveal important general practices, or may be considerably less germane to a world in which the NYPD has substantially curtailed or abandoned its out-of-state activities. Given the constant improvements to and alterations in NYPD capabilities and strategies, as well as the significant changes made to the Intelligence Division in the wake of the 2013 mayoral election that separated the initial request for records from the hearing on the motion to dismiss, Chief Galati's affidavit either failed to justify categorically refusing to acknowledge the existence of records pertaining to closed investigations or-equally fatally-must be taken to justify withholding such information permanently. As to type, whatever the counterintelligence capacities of gangsters and terrorists, garden-variety criminals ***254 (and law-abiding citizens) are probably not piecing FOIL reports into a jigsaw puzzle depicting the anticipated movements of NYPD officers.
Put aside the deficiencies in Chief Galati's affidavit. Still, its purported justification goes to terrorism-related threats only, *824 and the NYPD's FOIL response should at a minimum have read "We [have] [do not have] records of investigating or surveilling the petitioners on suspicions other **485 than terrorism. As to whether terrorism-related records exist, we cannot say." Accordingly, I would reverse the Appellate Division's order granting the motion to dismiss and remand the case to Supreme Court, where the NYPD can augment Chief Galati's affidavit and the parties can hash out, on a request-by-request basis, to what extent an entirely circumscribed response is appropriate as to past investigations.
B. The Petitioners' Rebuttal Evidence
In addition to challenging the sufficiency of the NYPD's affidavit, petitioners invoked one other safeguard native to FOIL and two modeled on federal FOIA decisions.
As to the native safeguard, petitioners have steadfastly requested in camera review.[6] Here, although the NYPD could have refused to confirm or deny the existence of records relating to ongoing investigations on the strength of only a public affidavit, the doubts the petitioners raised about the propriety of withholding information about prior investigations should have required Supreme Court, absent a very different affidavit, to order in camera review of responsive documents, if any. In Abdur-Rashid, the court abused its discretion in impliedly deciding to forgo that review. In Hashmi, uncontrovertibly, the court committed an error of law in concluding that in camera ***255 review, which it wished to undertake, was, by spurious analogy to the Glomar doctrine, unavailable.
In addition to requesting in camera review, petitioners alleged facts invoking two additional FOIL safeguards: the bad faith and official acknowledgment doctrines. The NYPD urges not only those safeguards' adoption but also their zealous enforcement; "Federal courts employing similar safeguards do not operate as a rubber stamp on agencies' use of the circumscribed response ... [P]rocedural safeguards are far from a paper tiger and allow for meaningful judicial review" (reply brief for respondents-appellants in Hashmi v. New York City Police Dept. , 140 A.D.3d 419, 37 N.Y.S.3d 64 [1st Dept. 2016], at 20, reprinted in record at 837). Because respondents are here on a motion to dismiss, it is our responsibility to accept all the facts claimed in the petitions as true, accord petitioners the benefit of every possible favorable inference, and determine only whether the facts as alleged make out any cognizable legal theory for defeating the protections of the FOIL exemptions (see Leon v. Martinez, 84 N.Y.2d 83, 87-88, 614 N.Y.S.2d 972, 638 N.E.2d 511 [1994] ). Under that standard, even had Chief Galati's affidavit made out a prima facie case for non-disclosure, the motion to dismiss should have been denied and the cases remitted to Supreme Court.
*825 Turning first to the bad faith doctrine, petitioners allege several grounds for their assertion that the NYPD is refusing to **486 confirm or deny the existence of responsive records not because that would cause a harm cognizable under a FOIL exemption, but because it wishes to conceal evidence of underlying illegality: an investigation and surveillance program premised on religious discrimination. The majority dismisses that argument by complaining that "other than general allegations arising from news reports, petitioners offered no evidence that the NYPD's response to these particular requests is a function of bad faith" (majority op. at 238, 76 N.Y.S.3d at 473, 100 N.E.3d at 812). In so doing, it ignores the standard of review appropriate on a motion to dismiss. The AP's Pulitzer Prize-winning series of articles detailing the NYPD's questionable conduct and efforts to cover up that conduct satisfies the threshold showing required to allow petitioners to "seek appropriate discovery ... to identify the procedures by which [the NYPD's] position was established" ( Phillippi, 546 F.2d at 1013 ). That showing is buttressed by the allegations that the NYPD, which took nearly eight months to respond substantively to the petitioners' requests, was "purposefully delaying the process" by supplying sequential notices of delay and by ***256 throwing up unusual objections to the form of the requests, including a particularly obstructionist cavil regarding a typographical error in Mr. Abdur-Rashid's name.
Second, the petitioners alleged the NYPD has already officially acknowledged the information it hopes to conceal by refusing to confirm or deny the existence of responsive records. In a June 2012 deposition in a different case, Chief Galati acknowledged that "none of the visits conducted by the Zone Assessment Unit [ZAU] resulted in an investigation." Although that statement is followed by some discussion of what constitutes an investigation and whether the ZAU was designed to pursue them, it seems in tension with the NYPD's claim that it had not already denied having, for example, "records related to any investigation of Talib W. Abdur-Rashid in relation to his activities as Imam of the Mosque of Islamic Brotherhood." In addition, in Hashmi, it is ambiguous whether Supreme Court found nothing in "Mayor de Blasio's well-publicized decision to disband the NYPD unit that had conducted the surveillance" that undermined the agency's ability to deny the existence of records or erroneously concluded, as the prior sentence of its opinion suggests, that the mayor was not the kind of senior executive branch official whose statements are "sufficient to effect waiver of a Glomar response" ( Hashmi, 46 Misc.3d at 723, 998 N.Y.S.2d 596 ). It may be that "whatever protection" the records "might once have had has been lost by virtue of public statements ... at the highest levels" ( New York Times Co. v. United States Dep't of Justice, 756 F.3d 100, 120-121 ).
Even if those disclosures do not satisfy the official acknowledgment doctrine, they, coupled with the information in the AP articles and in the leaked NYPD documents that accompanied those articles, may defeat the NYPD's refusal to confirm or deny the existence of certain responsive documents. Rather than grapple with the full scope of the disclosures, the NYPD fixates on the fact that they emanate from the AP, rather than from its own officials. That fixation "confuses the act of waiver ... with an agency's independent obligation to 'carry its burden' " of showing the mere disclosure of a document's existence would be protected ( Florez v. Cent. Intelligence Agency, 829 F.3d 178, 186 and n. 8 [2d Cir.2016] [rejecting a "per se rule barring consideration of third party disclosures"
*826 and instead remanding "to allow the district court to weigh the facts in the first instance" (emphasis omitted) ] ). A third **487 party's disclosures "cannot waive the asserting agency's right to a Glomar ***257 response, but such disclosures may well shift the factual groundwork upon which a district court assesses the merits of such a response" ( id. at 186 ).
Several references in the existing record suggest that has happened in this case. To give but one example, the petitioners requested "[a]ll directives and/or memoranda sent or received by the NYPD related to surveillance of the Rutgers Muslim Student Associations from 2006-2012." The AP published a copy of the NYPD's weekly Muslim student association report responsive to that request. It is untenable for the NYPD to neither confirm nor deny the existence of that responsive record. Once the existence of one record in a category must be disclosed, it may be that the existence of other records in the same category are not protected.
"The Glomar doctrine is in large measure a judicial construct, an interpretation of ... exemptions that flows from their purpose rather than their express language. In this case, the [agency] asked the courts to stretch that doctrine too far-to give their imprimatur to a fiction of deniability that no reasonable person would regard as plausible. 'There comes a point where ... Court[s] should not be ignorant as judges of what [they] know as men' and women" ( American Civil Liberties Union, 710 F.3d at 431, quoting Watts v. Indiana, 338 U.S. 49, 52, 69 S.Ct. 1347, 93 L.Ed. 1801 [1949] ).
The cases should be remitted to Supreme Court so the petitioners can augment the record with additional documents disclosed by the AP and so the court can consider the implications of the disclosure of those documents.
The majority's insistence on resolving these cases on the scant record before us privileges the expectation that FOIL suits will be resolved on the law over the reality that these FOIL suits turn, in part, on contested facts. It is at odds with our standard of review for motions to dismiss and inconsistent with the federal practice in Glomar cases of "first determin[ing] whether the district court had an adequate factual basis upon which to base its decision" ( Minier, 88 F.3d at 800 ). Whatever the majority's confidence in its conclusions, "[p]laintiffs are entitled to an opportunity to conduct their own litigation" ( Phillippi, 546 F.2d at 1015 ).
Even were the record not riddled with opportunities for further development, the appropriate remedy after resolving the ***258 thorny theoretical issue in this case of first impression would be to remit the petitions to Supreme Court for consideration unclouded by the overarching and overwhelming question of whether an agency may ever refuse to confirm or deny the existence of responsive records. Simply put, "we lack the benefit of an evaluation of th[ese] issue[s] by the [lower] court[s]" ( Florez, 829 F3d at 183-184, quoting Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 79 [2d Cir.2006] [Sotomayor, J.]; id. at 189 [collecting cases] ). Whereas the U.S. Court of Appeals for the Second Circuit was able when first addressing the Glomar doctrine to "adopt the District Court's careful and well-reasoned analysis" as that court "in the interest of thoroughness ... provided a detailed explanation and analysis of the affidavits submitted" ( Wilner, 592 F.3d 60, 71-73 [2009] ), none of the three lower courts whose decisions are before us today reached the fact-specific issues the majority now decides. *827 For that and the foregoing reasons, I would remit these cases to Supreme Court to provide both parties with a fair opportunity **488 to litigate their cases on the terms described herein.

It is, therefore, inaccurate to state that, at the initial stage of a FOIL denial, an agency "is permitted merely to deny a request, without explanation" (partial dissenting op. of Wilson, J., at 240-241, 76 N.Y.S.3d at 474-75, 100 N.E.3d at 813-14).

In analyzing the sufficiency of such a certification, this Court observed in Matter of Rattley v. New York City Police Dept. that a certification is required "[w]hen an agency is unable to locate documents properly requested under FOIL" (96 N.Y.2d 873, 875, 730 N.Y.S.2d 768, 756 N.E.2d 56 [2001] ). However, we have never held that a certification is required only when an agency grants a FOIL request and subsequently discovers that it has lost or does not possess the relevant records. Indeed, it would make little sense for the certification to apply only where a FOIL request has already been granted because an agency will not always be able to ascertain whether, and to what extent, a requested record is disclosable under FOIL without undertaking a review thereof.

The majority asserts that petitioners do not "analyze the propriety of the exemptions as applied to their requests" (majority op. at 227 n. 3, 76 N.Y.S.3d at 466 n. 3, 100 N.E.3d at 805 n. 3). Considering that petitioners are unaware of what, if any, records exist and cannot discern when, if ever, they were investigated, it is unclear exactly what argument the petitioners could make, other than that which is currently presented, which is that the NYPD's Glomar response is an impermissible blanket exemption that has not been authorized by the legislature. Again, the majority's response to this is to assume, without foundation, that the only records that exist, if any, relate to a "pending covert investigation" (majority op.at 227-228 n. 3, 76 N.Y.S.3d at 466-67 n. 3, 100 N.E.3d at 805-06 n. 3) and are, therefore, "protected under one or more FOIL exemptions" (majority op.at 233 n. 6, 76 N.Y.S.3d at 470 n. 6, 100 N.E.3d at 809 n. 6).
Further, the majority completely fails to address the implications of Glomar responses in cases where records exist that are not protected by a statutory exemption but which, nevertheless, will be shielded from disclosure and judicial review by such a response. Instead, the majority avoids this problematic aspect of its position by suggesting that petitioners limited the dispute to records concerning terrorism-related investigations. This is inaccurate. Petitioners' FOIL requests are devoid of any reference to terrorism investigations or to news articles relating to the NYPD's covert domestic counterterrorism operations. Petitioners requested, among other things, "[a]ll records related to any investigation of [petitioners] between 2006-2012," "[a]ll records related to [the petitioners] relied upon by the NYPD that led to any report being filed," and "[a]ll records related to the surveillance of [the petitioners] by [the] NYPD" (emphasis added). Indeed, the majority's apparent claim that the Glomar response was given only because the investigations at issue related to terrorism is untenable considering that the NYPD denied petitioners' administrative appeals, in part, on the ground that petitioners failed to specifically identify the nature of the investigations to which the FOIL requests pertained. Moreover, while it is true that petitioners referenced a series of news articles concerning NYPD surveillance of Muslim communities in their CPLR article 78 petitions-filed after the Glomar responses had been conveyed-at no point did they disavow or narrow their earlier requests for records pertaining to "any investigation." In addition, they maintained that the NYPD's response was an impermissible blanket exemption and that the NYPD should instead redact any records containing protected information. Despite the majority's repeated attempts to shift the blame to petitioners for the agency's noncompliant response here, it is unquestionably the NYPD's burden to demonstrate the applicability of an exemption to any records withheld-a showing that is woefully lacking.

The majority's failure to require any in camera review also increases the likelihood that a Glomar response will violate the precept that an agency "cannot refuse to produce the whole record simply because some of it may be exempt from disclosure" and, instead, should make every effort to redact protected information while disclosing exempt information (Matter of Schenectady County Socy. for the Prevention of Cruelty to Animals, Inc. v. Mills, 18 N.Y.3d 42, 46, 935 N.Y.S.2d 279, 958 N.E.2d 1194 [2011] ). Further, contrary to the majority's likening of its creation of a blanket exemption to this Court's prior approval of in camera review, unlike the Glomar response, FOIL expressly authorizes judicial review of an agency's response to a FOIL request (see Public Officers Law § 89[4][b] ), and our precedent clearly establishes the propriety of in camera review.

To the extent the NYPD also relies on New Jersey Media Group Inc. v. Bergen County Prosecutor's Office, 447 N.J. Super. 182, 188, 146 A.3d 656, 660 [N.J. Super. Ct. App.Div.2016] ), such reliance is misplaced. In that case, a New Jersey appellate court interpreted the New Jersey Open Public Records Act (OPRA), to permit an agency to neither confirm nor deny the existence of records when the agency "(1) relies upon an exemption authorized by OPRA that would itself preclude the agency from acknowledging the existence of such documents and (2) presents a sufficient basis for the court to determine that the claimed exemption applies" (New Jersey Media Group, 447 N.J. Super. at 189, 146 A.3d 656 ). That court held that a Glomar-type response was authorized in limited circumstances by language in OPRA providing that the statute "shall not abrogate ... [a] grant of confidentiality heretofore established or recognized by the Constitution of this State, statute, court rule or judicial case law, which privilege or grant of confidentiality may duly be claimed to restrict public access to a public record or government record" (NJ Stat Ann 47:1A-9 ). Under New Jersey law, "before OPRA was enacted, judicial decisions recognized the need to maintain 'a high degree of confidentiality' for records regarding a person who has not been arrested or charged" (New Jersey Media Group, 447 N.J. Super. at 203-204, 146 A.3d 656 ). Accordingly, the New Jersey court held that the mere existence of records pertaining to someone who had been investigated, but not charged or arrested, was exempt under the statutory provision exempting materials that were confidential under prior case law. FOIL, however, does not contain a similar provision.

The majority concedes this point, but claims-without any basis in record or fact-that FOIA requests analogous to those presented here are "rare" (majority op. at 229, 76 N.Y.S.3d at 467, 100 N.E.3d at 806). Moreover, while there certainly exists a federal case or two applying the Glomar doctrine to the FOIA law enforcement exemption (see Vazquez v. United States Dept of Justice, 887 F.Supp.2d 114 [D.C. Cir.2013] ), we note that the United States Supreme Court has never addressed the propriety of the Glomar doctrine, despite the majority's suggestion otherwise (see States Dept of Justice v. Reporters Committee for Freedom of Press, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 [1989] [addressing only whether the actual contents of a rap sheet are exempt under FOIA exemption 7(C) ] ).